# EXHIBIT A

Case 1:25-cv-06028-AKJCF Document 63-46 Filed 10/02/25 Page 2 of 40

16OKDOBA                    Argument

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MIKE DOBINA, et al.,

                Plaintiffs,

        v.                          11 CV 1646 (DLC)

WEATHERFORD INTERNATIONAL,
LTD., et al.,

                Defendants.

------------------------------x
                                    New York, N.Y.
                                    June 24, 2011
                                    4:06 p.m.

Before:

                    HON. DENISE COTE,

                                    District Judge

                        APPEARANCES

KESSLER TOPAZ MELTZER & CHECK LLP
     Attorneys for American Federation of Musicians
RAMZI ABADOU

ROBBINS GELLER RUDMAN & DOWD LLP
     Attorneys for Pension Trust Fund For Operating Engineers
EVAN JAY KAUFMAN
DARREN ROBBINS

SCOTT & SCOTT LLP
     Attorneys for Public Retirement Systems
MARY KATHERINE BLASY
BETH KASWAN

LATHAM & WATKINS LLP
     Attorneys for Weatherford International Ltd. and all
Individual Defendants
ROBERT J. MALIONEK

(In open court)

THE DEPUTY CLERK:  Matter of Mike Dobina versus Weatherford.  Counsel, please state your names for the record and the party you represent.

MR. ABADOU:  Good afternoon, your Honor.  Ramzi Abadou from the now Kessler Topaz law firm on behalf of American Federation of Musicians.

MR. KAUFMAN:  Good afternoon, your Honor.  Evan Kaufman with Robbins Geller Rudman & Dowd for plaintiff Pension Trust Fund For Operating Engineers.  And with me is Mr. Darren Robbins, who's a partner from our California office.  Yesterday we filed pro hac vice papers -- they have not been entered yet -- and he would like permission to be able to speak today.

THE COURT:  Thank you.  I'm sure there's no objection. Welcome, Mr. Robbins.

MR. ROBBINS:  Thank you, your Honor.

MS. BLASY:  Good afternoon.  Thank you for having us. Mary Blasy, I'm with Scott & Scott, and I have Beth Kaswan with me.  We represent the Fulton County Employees' Retirement Systems, Grand Rapids General Employees' Retirement System, Police and Fire Retirement System from Grand Rapids as well, and the Fort Worth Employees' Retirement Fund.  We go by the nice system of the Public Retirement Systems.

MS. KASWAN:  Good afternoon, your Honor.

THE DEPUTY CLERK:  For the defendants?

16OKDOBA                    Argument

MR. MALIONEK: Good afternoon, your Honor, Robert Malionek from Latham & Watkins for the defendants.

THE COURT: Welcome, everyone. I appreciate you coming in response to the order I issued months ago.

This case was filed on March 9th, and you know, in my March 16th order, I used a notice date of March 14th. Counsel have referred to different notice dates in their papers, but I used that to begin the countdown block for the 90-day period. And your applications pursuant to my order were due May 12th, and I set the conference date in March for June 24th, for today, which was just over the 90-day period.

I understand there is a California action, there are MDL proceedings, there's a derivative suit in Texas, and the parties have taken a variety of positions with respect to whether I should proceed or not. To some extent, the parties' positions, at least some of you, have changed with respect to that matter. So let me just explain very briefly why I have proceeded despite the fact that there is this MDL proceeding and the fact that my colleague in California chose not to proceed.

I'm principally informed by the statutory mandate. It's also my understanding that the MDL process is not meant to interfere with a district court's management of its docket and certainly not with its compliance with the statutory mandate.

It's also, I think, helpful, if the MDL process goes

16OKDOBA                          Argument

forward, that there be a plaintiffs class representative actually to advocate on behalf of the class, whatever position it should take. And of course, as at least one of you indicates in its papers, there may be no need for an MDL process, depending on the outcome of today's proceeding and how plaintiffs' counsel, whoever is chosen, chooses to proceed, and I'm not going to dictate that one way or the other. So for those reasons, I am proceeding today.

Thank you for your papers. I have reviewed them. I'd like to get some basic facts out of the way first. There is some discussion -- and I'm putting aside now the relevance of the issue but I'd just like to make sure I have the right facts. With respect to retained shares, for Operating Engineers, I have the figure 316,005 retained shares at the end of the class period, March 1st, 2011. I'm not quite sure what AFME's retained shares are. It gives two different figures. I'm not sure why the two different figures. I don't know what your retained shares at the end of the class period are.

Do you have that figure, Counsel? I have the figures from your papers, which is 33,400 shares and 2,100 shares, but there's just going to be one figure I don't know what it is.

MR. ABADOU: Your Honor, I can tell you that regardless of the figure, it's not the most retained shares of the movants before the Court.

THE COURT: Fine. But do you have the figure?

16OKDOBA                    Argument

MR. ABADOU: I do.

33,400, your Honor.

THE COURT: Thank you so much.

Now we'll go through the group of funds for Fulton County, the number of retained shares.

MS. BLASY: I can get that for you.

THE COURT: Please stand, Counsel.

MS. BLASY: OK.

The retained shares as of March 1st, 2011?

THE COURT: Yes.

MS. BLASY: My understanding is that they didn't retain any shares as of that date.

THE COURT: And I understand that the two City of Grand Rapids funds have no shares as of that date either?

MS. BLASY: That's right.

THE COURT: And with respect to Fort Worth?

MS. BLASY: 91,435.

THE COURT: Thanks so much.

OK. So, I don't want to cut anybody off -- I'll give everybody a right to be heard here -- but I thought it might just be helpful if I outlined my reaction, having studied your papers. And I guess the only thing besides your papers I've studied, and their attachments, is, I looked at the movement of the stock price during the class period, from April 25th, 2007, to March 1st, 2011, and made a general observation that roughly

16OKDOBA                          Argument

between, I don't know, sometime in September of 2008 and sometime in the late fall of 2010, the stock price was largely below the price to which the stock fell by March 4th, 2011, and, therefore -- and this has some significance to some of the arguments you folks are making -- it may be hard to prove out-of-pocket losses for purchases made during that period of time.

So let me give you just sort of a broad overview, sort of 10,000-foot level way, how I analyze this. I have three applications for class counsel. The largest loss -- and let's use LIFO calculations -- through the method which was used by each of you in your initial applications for appointment was AFME's loss of -- and I'm rounding -- 3.6 million shares. It's just confirmed that it retained at the end of the class period something over 33,000 shares.

The next largest loss is the Fulton County loss of $3 million; it retained no shares. The losses of the other applicants in the group are substantially less: City of Grand Rapids, 373,000, no retained shares; City of Grand Rapids Police & Fire, 323,000, no retained shares; Fort Worth, 626,000 and over 91,000 retained shares. As a group, they have a loss of roughly $4.2 million.

Operating Engineers has a loss of $929,000, a little bit more but roughly that, and it retained shares of 316,500. If Operating Engineers were chosen, this would be the eighth

16OKDOBA                    Argument

appointment of it as lead plaintiff in the last three years. It initially identified six cases in which it was lead plaintiff. The error was brought to its attention; it's corrected that submission to indicate that it is lead plaintiff in seven cases.

There's a presumption under the statute that its appointment would run -- if there were another adequate plaintiff and it seemed most appropriate, for whatever reason and all the circumstances, to appoint it, I wouldn't find this to be disqualifying, but I think it is a factor for me to consider. And I do think it is fair to say that the error in listing how many cases it's been lead plaintiff suggests something about the burden of being lead plaintiff in perhaps too many cases.

I don't prefer groups. I rarely, as in "never," appoint a group. I'm not saying I wouldn't ever appoint a group. If I found that to find the most adequate representative, I should look carefully at the group application and appoint a group, I would. But if I have an adequate plaintiff -- and usually that's an institutional plaintiff with a significant loss that is otherwise well qualified to represent the class -- I don't generally appoint groups.

So, for instance, if Fulton County had been the most appropriate lead plaintiff, I would have been inclined to pull

them out and ask them to be lead plaintiff by themselves.  I don't think there's anything wrong with making the group application; and in some circumstances, it may in fact be the strongest submission.  And certainly there's nothing wrong with a group being formed because the same counsel have provided portfolio monitoring services, as was the case here.  It's just, I think, an admission, though, that there's otherwise no underlying connection between the various entities.

So that brings us sort of circling back to AFME.  It has the largest single loss in any application here.  So let's talk a little bit about this argument that's been made, that the complaint that's been filed doesn't identify any misrepresentation or material omission that was partially disclosed during the class period in a corrective way that could be used to calculate a loss figure, and that, instead, we should look at just the retained shares figure at the end of the class period because under Dura obviously that is the most straightforward way to measure loss.  And this is an argument that Operating Engineers place a lot of emphasis on in their opposition papers.

But as several of the other papers point out, this wasn't their starting position, in terms of how to calculate loss here.  They began with a calculation of loss in the same way that AFME used to get to its $3.6 million figure, which was far in excess of the Operating Engineers $929,000 figure.

Also, there is a statement that in an amended complaint, there will partial disclosures alleged for April 20th, 2009 and January 25th, 2010, perhaps other dates.

Operating Engineers comes back and says, well, even if those are partial disclosure dates, we still have the most significant loss. And then the argument comes back and says, no, no, during the last half of the class period basically the stock was trading so low that you're not going to have an out-of-pocket loss to show for purchases in the late half of the class period.

So we could spend a lot of time and energy trying to figure out how all of these damage calculations might play out ultimately at the end of the day in settlement discussions or in litigation of a class action. But I think the simplest way to proceed in this case, given the parties' submissions and the record before me at this stage, is to start with the formula that each of the applicants used when they made their initial application here, which was a formula based on in-and-out trading during the class period and the calculation of a LIFO loss. And that leads you right back to AFME.

I note also that AFME does have some retained shares, not the largest number. We can put those numbers on the record. But to the extent that it's helpful to have a lead plaintiff that has a foot in both camps, some retained shares to show the impact of the March 2nd, 2011 announcement as well

16OKDOBA                         Argument

as losses sustained during the longer class period -- and I don't know if I've put these dates on the record -- which is April 25, 2007 to March 1st, 2011, I think that AFME meets that requirement.

So I expect that, Mr. Abadou, you're happy to rest on your application?

MR. ABADOU:  Yes, your Honor, I am.  I omitted something very important when I introduced myself, made my appearance, which is, a representative of AFME is here today, Will Luebking, and I wanted to introduce him and point him out.  Save for that, yes, your Honor, that's right.

THE COURT:  Do you want to spell his name for the record?

MR. ABADOU:  Sure.  It's L-U-E-B-K-I-N-G, first name William, middle initial J.

THE COURT:  Thank you.

MR. ABADOU:  Thank you, your Honor.

THE COURT:  So, Mr. Robbins, why don't I give you an opportunity to be heard.

MR. ROBBINS:  Thank you, your Honor.  Should I address you from here or from the lectern?

THE COURT:  Wherever you'd like.

MR. ROBBINS:  Well, I'll to do it right here.

I think you made a number of observations that I'd like to address.  The first comment was perhaps the most

16OKDOBA                          Argument

prescient, and that was the comment your Honor made about two cases versus having a single case here, having the MDL that's going to occur, and the necessity for having representation. And what we did in the interim is we reached out to the individuals associated with the Los Angeles case that are not here today, and we have been given an indication that, in light of an appointment here, that they will work cooperatively to dismiss that case and hopefully obviate the need for continuing the MDL. So I think we're on the same page there.

As to the merits, your Honor made some comment about retained shares, losses. I think what I'd like to start with is the statutory text -- I guess always going back to the statute is best -- and, that is, the Court is charged with what the Court has started to do already, which is make a determination. The statute says that very clearly. In the determination of the Court, there is going to be a calculation of financial interest. And your Honor's laid out your thoughts about that.

It's our view that the other two movants have asked this Court to ignore reality, ignore the facts, ignore precedent in this court, ignore precedent in the Second Circuit, and primarily ignore Dura, which your Honor has focused on by saying we need to just look at loss. But your Honor then says, wait a second, we started with a number and you, pension trust funds for Operating Engineers, moved the

number. But we didn't, your Honor. If you look at -- we did not. If you look at the opening brief, it has three numbers at page 6, our opening brief: It has a total number of shares purchased, it has a net number of shares purchased and a holding upon the disclosure, and it has a loss. That loss is 929. We stand by that number. There is no ambiguity that there was a loss of 929. Our point is --

THE COURT: I'm sorry, that loss was not based on the retained shares figure but, instead, the trading during the class period?

MR. ROBBINS: Correct, your Honor. That 929 was an absolute loss. We didn't say this is the financial interest in the relief sought. We gave a number of factors, all of which were relevant. For example, your Honor, I would take no position as to Grand Rapids or AFME being appointed with no recoverable interest, if they were the only movant. We didn't know who was moving, and so what we did was we put our loss, and we stand by that.

What we have now pointed out to the Court is that the determination that's to be made by the Court is the largest financial interest in the relief sought. And I don't think anyone here at this table can in good faith contest the notion that Dura has articulated there are limits on losses. It is not, as the Supreme Court said, a form of insurance for every dollar lost, absolutely not.

Well, your Honor is well aware of this.  Your Honor has probably penned more securities opinions than any other sitting judge in the United States, whether they be damages, motions to dismiss, sanctions, the entire panoply of the PSLRA.

THE COURT:  Not too many sanctions.

MR. ROBBINS:  Well, your Honor has looked at that because the statute has called for it, but the point is the same, the whole breadth of the statute and in great detail; one being of course in the dozen or so opinions penned in the WorldCom opinion but across the board in many.  And your Honor is well aware that the two seminal opinions that deal with the lead plaintiff issue come, one from the Third Circuit in Cendant and one from the Ninth Circuit in Cavanaugh, which almost ten years ago started a deal with this issue of what is financial state.

And what the Ninth Circuit says is, which movant has the most to gain from the lawsuit.  Well, when you lay that, your Honor, against Dura, it seems to me that it makes it very difficult for one to say, hey, I bought on September 13th, Lehman Brothers melted down a few days later, I fold two days later and I have a $5 million loss, I have the largest loss.  It's true you do, nobody can deny it under that scenario.  But is it recoverable?  Is it financial interest in the relief sought by the class?  And that's what the statute calls for.

Now, your Honor, 80 percent of the cases, the way it's

16OKDOBA                    Argument

done is just loss, calculate loss.  There's multiple disclosures.  Ms. Blasy is very fond of citing in her papers the Goldman Sachs decision that Judge Crotty issued a couple month ago --

THE COURT:  Did you do another loss calculation to submit to me?

MR. ROBBINS:  What we submitted to you was the recoverable loss associated with the 316,000 shares that were held.  And, yes, we did provide that.  I can cite your Honor at page --

THE COURT:  I have your opposition brief here.

MR. ROBBINS:  Your Honor, it's page 11.

When I refer to pleadings, your Honor, is it acceptable to refer to opening motion and opposition, or do you like docket numbers?  Which is preferable?

THE COURT:  Certainly not docket numbers.

MR. ROBBINS:  OK.

Your Honor, what we articulated is our financial interest at page 11 in that chart.

THE COURT:  You know, you didn't explain how you got to that figure.

MR. ROBBINS:  Your Honor, the column heading just takes the share number held times the decline.  And I apologize if that's not clear.

THE COURT:  But that wouldn't -- are you contending

16OKDOBA                          Argument

that the purchase price for those shares would have no impact on the loss calculation that would be recoverable under Dura?

MR. ROBBINS:  Correct, your Honor, because your Honor actually made a comment that touches on this.  You said the stock price traded down and, therefore, there would be no recovery.  But it actually doesn't make a difference.  In fact, Judge Breyer, in oral argument in Dura, said:  What about this, what about when somebody buys something at $30, it goes up to 50, and then it's revealed something that was concealed and it drops 10?  And he said, we're reserving on that.  There's actually a parenthetical in Dura that says, we're reserving on that issue.

But that's been dealt with in this district as far back as Crazy Eddie.  You know, 15 or so years ago judges have dealt with the notion that that is recoverable because that's associated with the purchase.  It was inflated at the time of purchase and the problem with loss causation is eliminated because now you see it -- the revelation was made and the stock dropped $2.38.  So regardless of whether those shares, your Honor, were bought at 27, 38 or 26, there is that inflation.

THE COURT:  And you're relying on the Crazy Eddie case?

MR. ROBBINS:  Yes, your Honor, Crazy Eddie, and there's a case in the Ninth Circuit called --

THE COURT:  I would like Second Circuit because I've

looked at Second Circuit law in Carlisle, 176 F.3d 601, on this point. It relied on cases as old as the Milken case in the Second Circuit.

MR. ROBBINS: Sure. I am not familiar with the Carlisle case. Crazy Eddie is obviously a district court decision. The Ninth Circuit case that I am familiar with -- and, I'm sorry, I don't have a Second Circuit at my fingertips -- is Green versus Occidental Petroleum, which this issue is discussed at length in the concurring opinion by Judge Sneed.

THE COURT: OK. I think we can move on to your next point.

MR. ROBBINS: My next point, your Honor, is that by attempting to look at bare loss in a situation like this, without delving deeper, really allows the litigants to take away from the Court that which it is charged with, making the determination.

In Dura, the Supreme Court said that a plaintiff must, quote, adequately allege, end quote, loss causation, the holding of Dura. Those words are filled with implications. "Allege" obviously means to be alleged in a pleading. That's obvious. But the other one is a little less obvious and that is adequacy. It needs to be adequately alleged. And your Honor knows that Dura followed on the heels of Lentell, the Merrill Lynch case that Judge Rakoff had that was decided --

L-E-N-T-E-L-L.  Lentell was decided a few months before Dura, dealing with the same issues, loss causation at the motion to dismiss stage.  And both of them talked about how you allege loss causation.  The Supreme Court saying adequately allege? Well, there is no way for the Court to make its determination as to what is adequate if it's not alleged.  It's a given.

And then the Second Circuit said a plaintiff must allege the facts sufficient to support an inference that it was defendants' fraud rather than other factors that caused the decline.

So what does this mean at the lead plaintiff stage? Because, your Honor, my colleagues, I'm sure, will get up and say, your Honor, we don't need to have a summary judgment hearing just to appoint a lead plaintiff, this is -- you know, we don't need expert testimony and all this other stuff.  But Judge Scheindlin dealt with this, this very issue, in the Centerline case, your Honor, which is 2008, Lexis 36406.  And Judge Scheindlin acknowledged that is a Rule 8 standard.  But Rule 8 is not meaningless obviously in light of Iqbal and Twombly in securities matters, Tellabs.  And she said, "Allegations must be plausible in light of competing inferences that may be drawn from these allegations," in the context of a lead plaintiff fight.

Well, how can this Court make a determination as to plausibility when they're not even there?  You have to have

allegations to determine whether they're plausible.  So what they asked this Court to do is look forward into a reality that may exist in the future -- it could be pled this way, it could be pled that way -- and make a determination.  What the Court has before it is the actual allegations.  And the judges of this court repeatedly -- I referred to Judge Crotty in the Goldman Sachs decision.  In that case, I'm familiar with -- my firm was appointed in that matter.  There were multiple -- sorry, multiple revelations or disclosures which, again, is what I would call the majority of cases, 80 or 90 percent, were in the area, where 10 or 20 percent of the cases allege a single disclosure.  And in that case Judge Crotty himself drew a distinction between Goldman and his prior SafeNet decision where he actually appointed a movant with a smaller loss because the larger movant had sold out before the disclosure. And he said:  I can't do that, given the state of the law.

Judge Crotty is not the only one.  Judge McMahon in the Veeco case made the same determination, V-E-E-C-O, at the lead plaintiff stage.  Judge Garaufis in the Eastern District really wrote kind of the tome's on this issue, your Honor, and the Comverse, C-O-M-V-E-R-S-E, decision where in that case he dealt with this issue.  He said:  Wait a second, we can't be unfair to the other litigants because the guy who pled the complaint may not have pled everything.  On the other hand, I can't speculate -- and he went through a very lengthy analysis

on each of these issues before refusing to accept the R&R provided to him by Magistrate Judge Reyes.

So there actually was opinion appointing one lead plaintiff, and he went through a rigorous analysis. These are just the Eastern District judges here in New York. We have cited you in the papers in the opposition five or six judges in what we call single-disclosure cases, former Chief Judge Patel out in Northern District of California in the VeriFone case Level Three, there's a series of cases that have dealt with this.

And in dealing with our application, Mr. Abadou cites heavily Judge Buchwald's decision maybe three or four months ago in Transocean, which was decided here in New York. I think there were multiple cases pending but ultimately decided here. And she made a very important point in that case, which I think shows why it's not instructive here. Like many cases, this was a class period that ran from 2006 to 2010. In the end of that class period, maybe two months before the end, there was the Deepwater Horizon explosion, the BP explosion, which everyone in the world is aware of and the implications of it, and when that happened Mr. Abadou's client, who was appointed in that case, sold off their shares after that partial.

Well, that's a different dynamic than we face here. So my point in mentioning Transocean is I see it throughout the papers, it really is not instructive here. I think that Judge

Garaufis' decision in Comverse is directly on point.

Ultimately, I take the admonition that was issued by Judge Koeltl in J.A. Solar, where he said: We have to deal with reality, we have to deal with economic reality, and that's what we're dealing with here. Again, we do not deny, your Honor, that we lost 929,000, and we do not deny that Mr. Abadou's client lost 3 or 4 million. The issue is, what is the financial interest in the relief sought? And the relief sought as pled is not the fictional world that they create.

Now, your Honor also said you looked at the stock price movement. When we talk about plausibility, I'd like to make one point -- not to belabor it, but I would like to make one point on the stock price movement: There's two disclosures that Mr. Abadou posits he will plead in the future. In fact, he represents, "I will plead them." We don't know how they're pled, what they'll say, or whether this Court will determine that they're adequate.

Ms. Blasy, on the other hand, says something happened in 2008. Well, it sure did; there was a market meltdown and there were other revelations of some kind. So she has one theory, he has another. But one thing is for sure: Mr. Abadou placed very heavy reliance on the April 20th, 2009 disclosure. He shows to the Court -- he actually puts in the releases and then the conference call transcripts, and shows how this capex issue is really an issue which he will plead as a partial to

16OKDOBA                              Argument

give him recoverable losses.

The problem is, your Honor -- and I can give you the exhibits -- is here's what happens in sequential order --

THE COURT:  Excuse me one second.

MR. ROBBINS:  Sure.

(Pause)

MR. ROBBINS:  April 20th is a Monday.  April 17th, 2009, the day before this purported disclosure, the stock closes at 14.75.

THE COURT:  I don't think we have to spend much time talking about April of '09 and January 2010.

MR. ROBBINS:  OK, not a problem.

The only point I'm trying to make is, the stock price actually in response went up, it didn't decline.

Other than that, I guess I would like to respond to your comments about what is 78U4A3, which is five-and-three rule that your Honor referred to.  There's some of what an oddity in the law in that plaintiffs are only required to disclose, movants, the last cases that they moved in the three years.  Then there's a -- the five cases -- sorry, the cases they moved in the last three years.  The prohibition is on serving more than five in three years, so you could be appointed further back.

And I just wanted to correct one thing:  Your Honor had said, I believe, seven, and I think they had been appointed

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16OKDOBA                    Argument

six.  The point is the same, and that is, in the last five years they have been appointed in six, I believe.  I can check that.  The point is, they have exceeded the five and three.  We concede that.

THE COURT:  I think your --

MR. ROBBINS:  You want me to --

THE COURT:  Excuse me one second.

I think your supplemental declaration, the Rosenfeld declaration, tab M --

MR. ROBBINS:  Yes.

THE COURT:  -- lists seven in response to 5(a).  I think the error was that you had originally listed six.

MR. ROBBINS:  Nothing like being mistaken about a mistake, huh, your Honor?  Sorry.

I believe -- and I will check -- I believe that was filed within --

THE COURT:  Excuse me one second.

Excuse me one second.  This Crazy Eddie decision, which is a magistrate judge decision from 1996, in the Eastern District, Magistrate Judge Go, which was adopted by District Judge Nickerson, has a fairly opaque sentence about a measurement of damages at 1165.  It's 948 F. Supp. 1165.  Is that what you were referring to, the Crazy Eddie decision?

MR. ROBBINS:  Your Honor, I do not -- and I apologize -- I do not have the cite for that.

THE COURT:  OK, well, good.  Thank you.

MR. ROBBINS:  May I provide that to you?

THE COURT:  No, I think we're fine.

MR. ROBBINS:  I apologize.

And your Honor is correct about the seven.  The error must have been focusing on the one before which I think highlights the fact that it was my ministerial error, not the clients', and I want to address that issue about whether putting it in paragraph (c) as opposed to (a) confirms that they are not adequate.  They are actually vigorously against -- in several cases they are doing very well, the Lehman case where Mr. Abadou -- Mr. Abadou's firm is serving as lead counsel, represents them in a case here in New York.  They are involved in several matters.  However, they have several trustees and they have someone designated to deal with this.  I'm actually going to meet with him next week.  I've spoken with him repeatedly.  I think they are actively engaged.

And I think that is why the statute itself says, as your Honor knows, except as the Court may otherwise permit consistent with the purposes of this statute, that the majority of courts just ignore this provision as to institutions, which, your Honor, we have cited the cases.  I don't agree with those decisions.  The statute is there for a reason, but the fact is, the vast majority, I would say 90 percent, of the decisions say that it does not apply to institutions, assuming they use the

16OKDOBA                    Argument

language consistent with the purposes of this section, meaning that it was designed to encourage institutional involvement. I think it's much more nuanced than that, and your Honor hit on it earlier.

Courts here -- Judge Owen in Pfizer, Judge Rakoff in the Credit -- we call it CBASS, Credit Based Asset Securitization case, found an entity, your Honor, Mississippi Public Employees Retirement System, they had dozens of cases going on, and he said this does not apply to them.

The Comverse decision by Magistrate Judge Reyes addressed this issue and said it should not apply here.

And, your Honor, the reason -- I think the well reasoned opinions -- and one of those is the Unum Provident decision that Mr. Abadou cited in his papers, they look into the facts and circumstances of the case. And they say, is there no other movant? Are all the other movants cobbled in a way that would subject them to attacks by the defendants that would jeopardize the class? Are there groups of movants, like in this case, is that a reason why we would not impose the bar? And those are the kind of special circumstances that exist.

Here, your Honor, absent this plaintiff, when the defendants bring the motions on and they show that someone has no financial interest in the relief sought, we posit, your Honor, they will bring on a motion and they will say, if somebody is sold out and the disclosure is made, that there is

16OKDOBA                    Argument

no recoverable damage and, therefore, the class has no

representation.  And we submit this is exactly one of the kind

of cases that the exception is created for in the statute.

        And that really is kind of the points that I wanted to

make, unless there's others your Honor wants me to address.

        THE COURT:  No.  Thank you very much, Mr. Robbins.  I

appreciate it.

        And, Ms. Blasy, are you speaking on behalf of the

group?

        MS. BLASY:  Yes, I am.

        As will be no surprise to you, I will be talking about

the group issue.  I represent the Public Retirement Systems.

You made a very prescient point, and I'm glad to hear that you

are open to the notion of groups and that you do believe it's

important to appoint a group if it's the strongest submission,

which it is here.  And I'll identify the reasons why.

        Your Honor's position is actually the same as most of

the judges here.  I sat in Judge Crotty's decision, who

probably took a big grand position that he just had no problem

at all with groups.  A lot of judges -- there's decisions that

go both ways.  The PSLRA does not clearly say that you can

appoint a group of pension funds, it doesn't say you can

appoint a group of individuals, it doesn't say there has to be

a preexisting relationship either.  So I just want to hit on

the high points on that.

As your Honor has recognized, a group is permitted directly, in fact, under the plain language of the statute, which says a person or group of persons can be appointed. As Judge Chin ruled in the McDermott matter, 2009 Westlaw 579502, he said exactly what I think is your position, he said: The majority of the courts, including those in this district, permit unrelated investors to join together as a group seeking lead plaintiff status if such grouping would be best to serve the class. And I submit here would be best to serve the class.

One of the reasons that we raised in our papers that you should focus on the largest financial interest rather than going to the single largest movant, which would be moving -- comparing Fulton County to AFME is because AFME's critically funded status -- that wouldn't -- I wouldn't make that argument as a reason that they could never serve as a legal plaintiff anywhere; I couldn't make that with a straight face and I wouldn't make that argument. But the fact of the matter is, they are under a lot of pressure right now, not that all pension funds in the country aren't. By the way, I have Craig VanerWall here with me, who is the vice chairman of the Grand Rapids Police and Fire Retirement System, who came out as well, in addition to somebody from the AFME fund.

That is just one factor I think that the Court should take into consideration. Most of the public pension funds -- or, excuse me, most of the retirement funds in the country are

16OKDOBA                    Argument

not on the Department of Labor's critically funded list right now. And as the submissions that we put in indicate, with municipal orchestras around the country filing bankruptcy to avoid pension obligations directly to AFME, that problem is not one that's going away quickly. But that reason certainly doesn't stand on its own.

Another reason that I believe that the Public Retirement Systems are the most adequate is something that Judge Rakoff addressed in the decision that's been mentioned a couple times here, Ironworkers Local 25 versus Credit-Based Asset Servicing, 616 F. Supp. 2nd 461 (S.D.N.Y. 2009), in that decision Judge Rakoff looked at -- he kind of compared Taft-Hartley retirement funds, which, as you know, the Taft-Hartley Act created these retirement funds that are based -- typically their trustees are formed half by employees and half by management of various different employers. And Judge Rakoff compared them to a public retirement system. And the fact that public retirement systems generally have an in-house general counsel -- our clients do. In fact, Fulton County's general counsel signed their certification and the joint declaration. The difference being that when you have an in-house general counsel, you have somebody to help you select monitoring counsel, you have somebody to help you select cases, you have somebody to help you oversee cases, and you have somebody to help you oversee whether or not your outside

16OKDOBA                    Argument

securities counsel is giving you the best advice as to when and how a case should be settled.

And that was a factor that Judge Rakoff found significant in that case.  As you may know, he was upset with the monitoring relationship in the Ironworkers case but he was less upset in the instance of the Public Retirement Systems, like my four clients are, than he was in the instance of the Taft-Hartley pension funds.  I'm not saying there's anything per se the matter with Taft-Hartley pension funds; it's just another factor that can be considered in favor of the four Public Retirement Systems.

A third consideration -- and this, I think, deviates from a point that I even think has that much importance but it's the preexisting relationship.  Obviously, the two Grand Rapids funds have the same chairperson, same executive director --

THE COURT:  Yes, and I should have made that point, yes.

MS. BLASY:  As Craig reminded me today, he also knows the executive director of the Fort Worth fund.  These are public pension funds that regularly go to the same events, they have the same interests, they work together on a lot of things. Here they made a decision to work together as a group from the beginning.  There was a claim made by one of the other movants that we should have made some more explanation as to how they

made the decision to move together.

For instance, in the Goldman Sachs case, there was a joint declaration put in that Judge Crotty said was fine. But if you actually read that declaration, it spends a lot of time explaining that decision; the reason being, because in that case there was two firms that were being moved for lead counsel and two more extra law firms that were just kind of along for the ride. So you had -- essentially you were trying to justify the reason that you would have four law firms in charge of the case, not the reason that you would have the group of individuals working together. And these are public pension funds; this is not a group of 25 individuals, not a group of 50 individuals, not even a group of five individuals. It's four public pension funds, two of which have an obvious close bond and all four of which have been clients of the Scott & Scott firm for over five years. We've been providing portfolio monitoring for each of those funds for over five years.

The Grand Rapids funds haven't done any cases; the other two funds have a lot of experience doing cases. And this is something they take very seriously. Each one has a litigation fund on their board of directors that specifically considers not just whether or not to move for lead plaintiff in a case, but if they have a claim in certain cases, they use some of the information to think about which money managers they should be using, things like that. They pay attention to

16OKDOBA                         Argument

the litigation that affects the value of the fund, in recognition of their fiduciary duties.

There is another issue, which is the representation at MDL hearing. The AFME did not put in any response. I don't think it can speak at the MDL hearing. Perhaps that's because it wants to go to Texas. There was a deadline to put in an appearance, there was a deadline to oppose that or support it, and AFME has ignored that. The other two movants, actually, both put in responses as to the MDL proceedings.

As a final point -- this is a locale thing -- Scott & Scott has a big New York office, and we will not cost the class any money to fly lawyers out here from around the country for various proceedings. That's -- it shouldn't be the first consideration but it's an important one. I have Beth Kaswan. I brought her because she's our head trial lawyer, and if this case goes forward here, Beth will be doing the case. And she's located here downtown New York and that's a benefit to the class. Her skill -- she as over 30 years of experience litigating before this particular court and courts in this district. She's just a skilled litigator and it would cost the class less money if it had a law firm with counsel right here in downtown Manhattan.

THE COURT: Excuse me one second.

(Pause)

THE COURT: Sorry, thank you.

MS. BLASY:  That's all right, thank you.

I made the comment a couple times, I think, in the papers:  There's nothing really that one -- that I don't think that Congress had in mind that one public pension fund can do that four couldn't do probably better.  Four allows people to come out here -- we have two of the movants, you know, came out here, people from the pension funds came out for this hearing. That's -- if you want the pension funds to be involved in the litigation, to be watching what's going on, it's helpful to have a few people.  I'm not saying have a whole group of people, obviously -- then you have the opposite problem, that nobody's paying attention -- but having four funds is helpful in that it takes the pressure off any one of the funds.

There's a lot of cases.  And you recited way more cases than I cared to read over the last couple days, but I can provide the Court with a stack of cases showing where funds have either been disqualified for one reason or another, they've on their own decided to step out for one reason or another, and they've had to withdraw for various reasons that would leave the class completely unmanned; whereas, when you have a small cohesive group of institutional investors, such as the Public Retirement Systems, this won't have that problem.

We also have -- Fulton County, as was indicated, held shares throughout the period.  Some of the other movants sold shares during the period.  Your Honor pointed out the stock

chart. The interesting thing is that we could focus on the existing complaint if we wanted to and the fact that it just has one disclosure right now. But obviously if you look at the chart, you're going to see that there's a lot of trades towards the back half of the class period that people don't have losses, they can buy all the shares they want, they might have even had gains on those shares.

So I think it's important for diversity in this particular case because of the way the stock chart looks and because these are four very responsible public pension funds that have come forward and they want to represent the interests of the class here, and I think we would do a good job in doing so. And I appreciate your remembering what you said, that you would appoint a group if the group was the strongest submission, and it is the strongest submission here.

THE COURT: Thank you.

MS. BLASY: Thank you.

Mr. Abadou, why didn't you put in papers in the MDL?

MR. ABADOU: Simple answer, your Honor -- and this was raised by Ms. Blasy just now, it was also raised in the operating fund's opposition at footnote 9 -- the simple answer is, under the rules governing the MDL, you don't acquiesce, your Honor, to anything unless you are a party to the litigation. None of these funds at this stage of the litigation, until someone is appointed, is a party to the

litigation. Currently there are two plaintiffs, Mr. Dobina here and the plaintiff that filed in California. So the citation to the rule, 6.1(c) is, in fact, inaccurate. We are all interested parties, so the rule that governs is Rule 16.2(e) because we are interested parties. As an interested party, you acquiesce to nothing by not filing papers.

The MDL hearing is in San Francisco on July 28th. We will attend and we will support transfer of these actions to this Court. And I hope that answered your question.

THE COURT: Thank you.

I wanted to say, by moving here, ahead with my schedule, and pursuant to my order in March, I am doing what I think I should do, is my reading of the statute and my understanding of my obligation. I am not commenting at all on a fellow judge's understanding of what is appropriate. And whoever is chosen as lead plaintiff today, you don't have to make a commitment to me about which case you proceed in or where you proceed in the litigation. That is not part of my analysis. Lead plaintiff, in consultation with class counsel, has to do what's best for the class and choose the appropriate venue to proceed within the litigation. So I think that's an independent, separate issue.

Good.

MR. MALIONEK: Your Honor, if I may, the defendants obviously do not have a dog --

16OKDOBA                    Argument

THE COURT:  Yes.

MR. MALIONEK:  -- in the fight of who is appointed lead plaintiff.  We do have one interest here, in efficiency. And, your Honor, we understand your comments with respect to why you believe it's necessary to make a ruling today under the statute.

It is our view that because of judicial efficiency, for efficiency to the parties, it would be more appropriate to delay a ruling until after the MDL actually issues its order.

THE COURT:  That may be the defendants' views --

MR. MALIONEK:  That's fine.

THE COURT:  -- and I appreciate you stating it.

MR. MALIONEK:  We appreciate your Honor's comments on that.  We understand.

THE COURT:  Thank you so much for sharing that.

I was aware of the arguments made with respect to AFME being on the critically funded list.  I read its response to that also, and it's fully funded, in terms of its public announcements on these issues, for decades to come.

As we all know, given what we read in the newspapers, any funds these days are under pressure, and that includes a wide variety of funds.  I was very impressed, Ms. Blasy, with your argument about asking me to focus on the difference, though, between the public employee funds and the Taft-Hartley funds and the ramifications for that, in terms of supervision

of a litigation, and I appreciate that is an important factor to consider.

I think the only other comment that I should make is with respect to issues Mr. Robbins raised. I do agree that what I have to analyze here is a financial interest in the relief sought. But it's early days in the litigation and, in effect, we're not trying to anticipate every summary judgment argument that might be made or every argument that might be made in opposition to certification of a class. But doing the best that we can, based on the complaint as it's now pled and the financial records and trading activity, I've looked at each of those; I've looked at the pattern of buys and sells for each of the proposed plaintiffs -- and that's six in all -- I've made charts in different ways, we've pinned down LIFO losses and retained shares, and I've tried to be sensitive to the fact that the litigation will evolve and I should have someone who's well suited to represent the class as it evolves. And I would like someone with a foot in both camps, that is, with retained shares at the end of the class period and someone with a significant financial stake, having invested a significant amount in this security and the motive that provides to be an active plaintiff, supervising counsel, representing the class effectively, thinking hard about what's appropriate in terms of settlement, if that happens here, and being willing to undergo discovery if it goes further than the initial stages.

16OKDOBA                          Argument

So, thank you, Counsel.  This has been very well argued motion, and I appreciate the arguments you've made in your papers, your presence here in court, in particular the presence of representatives of two of the putative plaintiffs.  But for the reasons I first outlined, I am going to appoint AFME as lead plaintiff.  And even if the calculation of a loss in a securities action is as Mr. Robbins suggests, that would not change my analysis.

I've also looked at the application of Barroway Topaz to be lead counsel for the class, and I approve that application on behalf of AFME.

I have to say, Ms. Blasy, I think your point was well taken about the cost of litigation from having out-of-town counsel, but I don't actually know it will be litigated in New York but I think it's a point well taken.  I try to make sure, though, that we don't have conferences in court unless we actually need them, and I'm hopeful that Barroway Topaz would be sensitive to the management of the class action in a way that will be most efficient for the entire class.

I have no idea if I have written more securities opinions than other judges, but I'm sure that I have filed my fair share of opinions on counsel fees, so I expect counsel know I will look carefully at any application at the appropriate time, if that comes before me.

We'll get out an order with this appointment, and I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

trust, Mr. Abadou, you will do what is necessary to figure out how to represent the class.

Let's talk about a schedule. And, Mr. Malionek, I'm glad you're here. Let's talk about a date for the filing of an amended complaint.

Mr. Abadou, when do you want to do that?

MR. ABADOU: Historically, your Honor, we ask for 60 days. 60 days would be appreciated here. I know lawyers have asked you for 60 days in the past and you have set 45, so we'll do whatever the Court wants.

THE COURT: Well, you're fortunate in the sense that your 45/60 days falls in the month of August --

MR. ABADOU: Right.

THE COURT: -- just as if it fell over December/January, you'd get some extra time from me.

MR. ABADOU: Thank you. My mom is going to be in town, so I appreciate that; I don't see her very often.

THE COURT: August 26th for an amended complaint.

MR. MALIONEK: Your Honor, the defendants then would ask for the same amount of time, 60 days for the filing of the motion to dismiss.

THE COURT: I'm afraid not. But because you fall in August and over Labor Day weekend, I will give you more than your 20 days. So any answer, a motion to dismiss, September 30th; opposition, October 21; reply, November 4th.

16OKDOBA                    Argument

          If this case stays in this district -- and, again, I've looked at complaint, I've looked at the stock pattern, I've read your papers -- I think I'd like to send you for settlement discussions sooner rather than later.  Your magistrate judge is Judge Francis.

          Mr. Malionek, do you need a decision on your motion to dismiss before you talk settlement?  Probably not, I think.

          MR. MALIONEK:  I think not.

          THE COURT:  Good, OK.

          It's probably helpful, though, to see the complaint; am I right?

          MR. MALIONEK:  Oh, certainly, your Honor.

          THE COURT:  OK.

          So I'm going to ask counsel to contact Magistrate Judge Francis no later than August 5th to arrange for settlement discussions under his supervision.  That will hopefully put you before him in early September.  I'll make an immediate referral so you can contact him next week if you want, but this is a no-later-than date.  So you must contact him no later than August 5th to arrange for settlement discussions under his supervision.

          And assuming there is a motion to dismiss and it is not granted, I'll have another conference after I issue a decision to set a schedule for discovery, et cetera.

          Thank you, all.

16OKDOBA                          Argument

          MR. ABADOU:  Thank you, your Honor.

          MR. MALIONEK:  Thank you, your Honor.

                              * * *