# EXHIBIT B

8AV4TEXC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
RUDOLPH T. TEXTOR,
individually and on behalf of
all others similarly situated,
                Plaintiffs,
            v.                          08CV7041(DLC)
NOVAGOLD RESOURCES INC., et al.,
                Defendants.
------------------------------x
CITY OF INKSTER POLICEMEN AND
FIREMEN RETIREMENT SYSTEM,
individually and on behalf of
all others similarly situated,
                Plaintiffs,
            v.                          08CV7854(DLC)
NOVAGOLD RESOURCES INC., et al.,
                Defendants.
------------------------------x

                                        New York, NY
                                        October 31, 2008
                                        9:30 a.m.

Before:

                    HON. DENISE L. COTE

                                        District Judge

                         APPEARANCES

KIRBY McINERNEY
     Attorneys for Plaintiff Movant Trapeze Capital
MARK A. STRAUSS
ANDREW McNEELA

LABATON SUCHAROW
     Attorneys for Plaintiff Movants Novagold Investor Group
     New Orleans Employees Retirement System
JOSEPH A. FONTI

LABATON SUCHAROW
     Attorneys for Plaintiff Movant Novagold Investor Group
ANDREI V. RADO

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

8AV4TEXC

                              APPEARANCES
                             (Continued)

SCHIFFRIN BARROWAY
     Attorneys for Plaintiff Movant Novagold Investor Group
NAUMON A. AMJED

COUGHLIN STOIA GELLER RUDMAN & ROBBINS
        Attorneys for Plaintiff Movant Plumbers & Pipefitters
        Local Union No. 630
MARIO ALBA

MORRISON FOERSTER
        Attorneys for Defendants
JACK C. AUSPITZ
JAMIE A. LEVITT
DAMION K.L. STODOLA

(Case called)

THE COURT:  Good morning, counsel.  Welcome to everybody.  We have essentially three applications for appointment of lead plaintiff in this law firm.  I don't know if the Plumbers & Pipefitters want to stay in contention or not.  Is that Mr. Alba.

MR. ALBA:  Yes, your Honor.

We have not withdrawn our motion.

THE COURT:  Fine.

MR. ALBA:  We are still able to serve.

THE COURT:  Good.  We have received various competing submissions.  I want to give you my overview of where we stand with respect to these competing submissions and give anyone then an opportunity to be heard who wants to be heard.

Yesterday my chambers asked counsel for Trapeze to provide us and circulate to other counsel a copy of the agreement with the accountholders and I have had an opportunity to look at that now.  I want to note that I am still unable to find in any of the submissions one of the documents that is referred to I think a couple of times in the Trapeze papers.

It talks about a Schedule A to its certification and it's quoted as making a representation about being an attorney-in-fact.  It cites the declaration of Mark Strauss executed on October 6.  Exhibit B, Schedule A at 154, docket number 11, I have never located that; I don't know to what it

is referring.

MR. STRAUSS:  Your Honor, hopefully everything was filed correctly.  What it was referring to was, Exhibit B is the certification of the main plaintiff.  Exhibit B to my declaration is the certification of the main plaintiff. Schedule A of that certification is the list of transactions in the subject securities.  It's 154 pages long.

At the end, on the last page, there is an indication that Trapeze Asset Management and Trapeze Capital managed the investments in question on a fully discretionary basis and Trapeze is authorized to act as attorney-in-fact with respect to the investments and has full authority to make all investment decisions as well as authority to bring suits to recover investment losses.

That was part of the certification, judge; usually a schedule A is not quite so long.

THE COURT:  I don't know who is making that statement and on what it is based.

MR. STRAUSS:  Your Honor, the declarant of the certification is making that statement and if it pleases the court, I will explain on what it's based as part of my argument.  Typically certifications include this kind of disclosure in investment advisor context.  This is not unusual in the way we formulated it here.  Your Honor, if it pleases the court, I can present some argument on this point, if I may.

THE COURT:  Well, actually, I have looked at, why don't I proceed first, then if you still want to be heard, I will give you that opportunity.

I have reviewed the cases that have been cited by counsel and some others that we have located on this issue.  I have to say, because so much turns on the Trapeze application on the issue of whether or not they are in an attorney-in-fact and the beneficial owner of the securities, I would have expected the issue to be addressed in the moving papers with a full discussion of the legal authority and the supporting documentation.

In any event, I have looked at the asset management agreement, not only the sections that there are asterisks but other sections that seem to me potentially relevant.  I don't see anything that suggests that Trapeze would have standing to act as lead plaintiff in this case.  To the extent there is a power of attorney conferred, it's very limited as described in paragraph 2.  There is discretion with respect to buys and sells, and of course there is the right to vote as described in paragraph 7 and elsewhere in this agreement.

But the discretion is limited to the traditional roles that an asset manager provides, and there is nothing that would suggest from my review of the document that it has the power to act as lead plaintiff here or otherwise should be considered the owner of the securities.

So, unless the argument changes that analysis, we are left with in my mind four other individuals or entities that have sought appointment as lead plaintiff here. The facts as described in these briefs to me, and again I may change that view after I hear from counsel, suggest that the loss causation date that is going to be critical in this case is November 26, 2007, the announcement date. Therefore, someone who was in and out of the Novagold securities before that date will not be able to show any loss triggered by the alleged fraud.

That means that New Orleans is not eligible for lead plaintiff status. Textor apparently is. It appears from the submissions that the purchases were made in November 2007 but sold November 27, 2007. I don't know if that's a settlement date or an actual sale date, so we need to confirm that. Then we go to Mr. Page. He made purchases between April and November of 2007, and it looks like he held all of his shares as of the trigger date of November 26, 2007; therefore, it was a total loss for him as it is for Mr. Textor. Then we go to Plumbers. Plumbers bought its shares in December '06, sold some in early November '07, and it appears that it held 17,500 shares as of the trigger date of November 26, 2007. I want to make sure I am reading that right.

In terms of the size of the financial stake in a way that could support a claim of loss due to the fraud alleged here, it looks like Mr. Page has the largest stake, followed by

Mr. Textor, followed by the Plumbers.  If that's right, I will focus most carefully on who Mr. Page and who Mr. Textor are.  I am going to want to know something about them as individuals so I can assess who would be the appropriate plead plaintiff here.

But that's my overview of where we stand.

Could you identify yourself for the record.

MR. RADO:  Andrei Rado from Labaton Sucharow for the Novagold Investor Group.  I want to speak to a comment the court made about New Orleans being out as of share ownerships before the corrective disclosure.  In fact, it did not settle all of its stake by that time.

THE COURT:  Let me look at the papers.  Hold on one second.  I am at the October 6 declaration of Ms. Nirmul; I am at tab 8, the second certification on behalf of New Orleans.  I am three pages into that certification where it lists transactions in Novagold.  Does it mean that there were shares held after the trigger date.

MR. RADO:  Yes, I think --

THE COURT:  That I should have added up the sales against the purchases.

MR. RADO:  Yes.  I think what makes it clearer is the loss chart submitted as Exhibit C of that same declaration.  In the middle of the page it discusses New Orleans' stake.

THE COURT:  I am sorry, in the middle of the page --

MR. RADO:  -- it discusses the sales transactions and

it says retained 10,500 shares.

THE COURT:  Great.  Thank you.

With respect to Mr. Textor's sales on November 27, are those post-disclosure sales.

MR. AMJED:  I believe they are, your Honor.

THE COURT:  Thank you.  So I think that means that in terms of the size of the stake, Mr. Page has the largest, then Mr. Textor, then Plumbers, then New Orleans, the largest of the stake in terms of someone able to assert loss due to the alleged fraud.

MR. STRAUSS:  Your Honor, we respectfully disagree that we are not able to assert loss with respect to the alleged fraud.  We would like to make two points.  We are not the traditional investment advisor that's referred to in these cases.  In our situation, we were the purchaser and we were the beneficial owner of the shares that we purchased legally and practically, as set forth in the declaration of Mr. Abramson who filed in connection with our opposition papers, paragraphs 6 and 7 of that I believe, he lays out what the procedure was that was followed here.

THE COURT:  Excuse me.

Where would you like me to look.

MR. STRAUSS:  The Abramson declaration filed October 23 in connection with our opposition papers.

THE COURT:  I have the declaration; what paragraph.

8AV4TEXC

MR. STRAUSS:  6 and 7, if I can make sure I am referring the court to the right place.  Our point is that in our particular situation we went out into the market as a single investor and purchased the Novagold shares in our account; the transaction settled in our account.  Subsequently, up to two or three days later, pursuant to the agreements that we had with our clients, we suballocated or lodged those shares in our clients' accounts at an average price.  So as far as the market is concerned, as far as the SEC is concerned, we are the purchaser and we are the beneficial owner of the shares.

Therefore, we are required to file the 13Ds with the SEC if we own more than 5 percent.  That's in the record.  I have an example of a 13D.  A 13D is something that's filed, it's called a beneficial owner report.  We are the beneficial owner.  We are the reporting person.  That's not the way most advisors or many advisors work, but this is the way we work.

The cases that our opponents rely on all involve advisors who simply implement the transactions that were in the accounts of their clients and now they are attempting to in essence aggregate those accounts.  That's not what we did.  That's not how we operate.  What it means in this context is our clients wouldn't have 10b standing.  They are not the purchasers.  They didn't purchase in their accounts on fixed dated and fixed amounts during necessarily during the class period.

8AV4TEXC

It's conceivably possible that we went out and purchased shares in the market during the class period, I don't know if it's true, I have not analyzed the data, and allocated them to the client accounts after the class period.  So in this situation, your Honor, we are the purchaser, we are the beneficial owner.  We have the obligations of a beneficial owner.  If proxies come out for voting the shares, they come to us; they don't go to the client.  We are the beneficial owner, and if we don't have a remedy, we are the largest purchaser here, we lost $13 million, $12 million.

THE COURT:  No, you didn't lose.  Your clients lost.  The accountholders lost.

MR. STRAUSS:  The cases make absolutely clear that, we stand in no different situation than say a mutual fund that goes out in its own account and in its own name and purchases shares.  We relied, we made the investment decision, we went out as a single investor in the market and purchased.  So we are the beneficial owner of the shares for legal purposes.  That's why we filed the 13Ds.  If we don't have standing, no one would have standing with respect to our shares, and there would be no remedy.  The other point --

THE COURT:  I am sorry, why don't the accountholders have standing.

MR. STRAUSS:  They didn't go out and purchase; they were allocated shares pursuant to a contract they have with us.

THE COURT:  Well, I mean --

MR. STRAUSS:  It's not the typical advisor type of situation.

THE COURT:  I don't know you really want to argue that.  I don't know that that is correct as a matter of law and construing the agreement that was supplied yesterday.  Counsel, you know, I understand these are complex issues.  That's why they deserved to be briefed with more care in the initial application with a copy of the relevant agreements and an analysis of the law.  I am not convinced.

MR. STRAUSS:  Our second point is even if we were a traditional investment advisor, we meet the standards.  There is simply no case where an advisor had submitted a form agreement that contained an express authority to bring a lawsuit.  Those kinds of things just do not exist.  That's why the case law doesn't say you have to have the power of authority to bring a lawsuit.  It says you have to have discretion and you have to be attorney-in-fact.

What does attorney-in-fact mean.  It means that you are appointed as agent for a particular purpose.  Here the particular purpose is the management of the investment.  It's beyond just discretion to purchase and sell that we have here. We have created the record that we have the right principally to vote the shares.  We can vote proxies.  We can vote for directors.  We can tender tender offers.  We put claims into

8AV4TEXC

bankruptcy.  We put claims into class action settlements.

These are the aspects of an attorney-in-fact.  Your Honor, they rely upon, I will get the affirmative case, the case *Labranche*, Judge Sweet, S.D.N.Y. 220 F.R.D. 398.  It's not cited in our papers.  It rejects the idea that an advisor needs to have express authorization to sue, specifically rejects it.  The *Weinberg* case, the leading case, says all you need to have is a declaration certifying that you have discretion and that you are the attorney-in-fact.

When you have an investment advisor who is entitled to vote shares, do all the things I just enumerated which we are, that's an attorney-in-fact.  There is no requirement of express authorization to sue.  They point to *E-Speed* for that proposition, but that was just dicta.  That case involved a family member who was claiming to be something like an investment advisor akin to an investment advisor for another family member nothing to do with the circumstances here where we have an institutional investor who is an institutional money manager.  So, your Honor, we think that we meet all the standards.

They also point to the *Suprema* case from Judge Walls in New Jersey.  They don't note Judge Walls essentially reversed himself several months later in the *Roth v. Night Trading* decision, 228 F.Supp. 2d 524, where he appointed a lead plaintiff based on the fact he submitted a certification saying

8AV4TEXC

he has complete investment authority over the trades and is agent and attorney-in-fact with full power and authority to act in connection with its investments.  That's it and that's all that's required.

We submit we have met all these requirements.  Most courts say it's a very good thing to have investment managers such as ourselves as lead plaintiffs because we  owe fiduciary duties and we are tremendously motivated.  That's what we have here, your Honor.  Trapeze acknowledges these fiduciary duties.  In fact, we negotiated a very competitive agreement.  We would be glad to submit it to the court for your review, because recognizing the fact that they had a fiduciary duty to the class.

To hold what the court is suggesting that you have to submit a form agreement that enumerates explicitly an authority to bring a lawsuit, first, in the industry it just doesn't exist.  Our opponents have not cited any case where there was that kind of agreement between a manager and a client, and to say that's required is just an overly stringent requirement that would eliminate an entire class of institutional investors from having standing to sue under 10b-5, not just to be a lead plaintiff, to have standing to sue.  It doesn't make sense.

These institutional investors are the ones who rely, they are the ones who made the investment decision, they went out into the market and did the purchase.  In our particular

8AV4TEXC

situation we did the purchase in our account and we are the beneficial owner and we are entitled to sue, your Honor.  There are many cases, we have cited them in our brief, where courts say all you need to have is investment discretion, full stop, no attorney authority.

There is a case in the Southern District that says that, *Lemanic*, cited in our brief.  There is a new case called *Dyadic*, 2008 WL 2465286 from the District of Florida that adopts that view.  The courts, the leading authorities, judge, I acknowledge some of the cases are in different places on the map but the leading cases, the weight of authority is that you don't need a specific enumerated authority to bring a lawsuit.

The fact is that those agreements just simply do not exist, those form agreements between managers and clients in the real world do not exist.  It would create an impossible situation where a manager who is the beneficial owner wouldn't be able to bring a lawsuit.  What do they submit in response. The PSLRA requires they submit proof.  They have nothing but speculation.  They don't have any proof that we are an inadequate plaintiff.

THE COURT:  I think the burden is on you to support your application and I think the burden was on you to support it in your initial application.  I thank you.  I know these are important matters and you have a sophisticated client.  I would have been happy in other circumstances to appoint them lead

8AV4TEXC

plaintiff, but I am not going to here. Obviously, we would be buying into a whole can of worms for the future litigation in the course of this case.

I am not convinced on my review of the case law what you are arguing to me would ultimately be how I would rule. You did not suffer the damage here. Well, you didn't. Even dealing with the question of whether at the very end of the class period for a few days before you allocated the shares, they were in your possession and not the accountholders' possession, OK, but they are not now. The losses now are sustained by the accountholders.

So counsel, thank you for your valiant efforts.

MR. STRAUSS: One last thing, if I may, your Honor. The securities laws do not say that the ultimate owner is the only who has standing. They talk about purchaser standing. If what your Honor was saying was correct then investment managers would never have standing under 10b-5. That's simply not true. They are held to have standing all the time, judge.

THE COURT: Counsel.

MR. STRAUSS: Thank you, your Honor.

THE COURT: I have to say these are complex issues and if your client was going to be asking to be lead plaintiff here, I would have expected, given the complexities of the issue, that the brief in support of that application would have been a very complete, thorough and analytical presentation on

this point, not one in which I am left to try to understand and figure out what's happening here and where you could very well anticipate if other plaintiffs wanted to represent the class, they would have come in and presented an opposition to this.

MR. STRAUSS:  I apologize for that lapse.  At the time we were focused more on the foreign plaintiff issue.  As in the *Labranche* case, there was no issue.  The court did not even think there was any issue with respect to the fact there was an investment manager.  So, judge, in the *Labranche* case, the court did not cite any showing that was made as to authority.

THE COURT:  I have to tell you I am not going to take a conclusory statement by someone in a boilerplate certification application that says I am an attorney-in-fact. I want to know what that rests upon both factually and legally. So, thank you, counsel.  I really appreciate your attempt here.

Let me turn to counsel for Mr. Page.  Who is Mr. Page.

MR. RADO:  Your Honor, Mr. Page has moved jointly with two other movants.

THE COURT:  I understand that.  Who is Mr. Page.

MR. RADO:  Mr. Page is a retiree living in Wisconsin.

THE COURT:  Have you spoken to Mr. Page.

MR. RADO:  Yes, I was on a conference call with Mr. Page and the other movants to discuss motions and the case.

THE COURT:  Tell me something about Mr. Page besides the fact he is a retiree living in Wisconsin; what did he do

8AV4TEXC

before he retired.

MR. RADO:  I don't know what he did.

THE COURT:  Is he in good health.

MR. RADO:  I have not, I don't know.  I have spoken to him on the phone.  He was participating in the call.  He sounded excited to be in the case.

THE COURT:  Is he a sophisticated investor.

MR. RADO:  On the phone sounded well aware of the issues and he knew why he was here.

THE COURT:  What kinds of investments does he make as a matter of course.

MR. RADO:  I don't know the answer to that.

THE COURT:  Did he use an investment advisor to make the purchases here.

MR. RADO:  I don't believe so; there is no indication that he had.

THE COURT:  You don't know.

MR. RADO:  No.

THE COURT:  Thank you so much.

Let me inquire about Mr. Textor.  Who is counsel for Mr. Textor.  Who is Mr. Textor.

MR. RADO:  Mr. Textor is union official from Colorado. I believe he represents several union funds.  This is however his personal investment.

THE COURT:  What do you mean he represents several

8AV4TEXC

union funds.

MR. RADO:  I think he is, I am sorry, he is the political director of Local 455 Teamsters Union out of Colorado.

THE COURT:  What do you mean he represents union funds; you mean in terms of securities matters.

MR. RADO:  No, I meant --

THE COURT:  He is employed by the union.

MR. RADO:  His official title is political director of the Teamsters Local 455 that's his official title.

THE COURT:  How old is he.

MR. RADO:  I don't know.  There is a picture of him here; he appears to be middle-aged.

THE COURT:  What kind of investment experience does he have.

MR. RADO:  I don't know his specific investment experience.

THE COURT:  So I think that takes us in terms of the next largest share in terms of loss caused by the fraud to Plumbers if I remember correctly.  So Plumbers indicates that it has not sought to serve or has served as a representative party in a class action in the last three years except, and then it lists two, one in Connecticut and one in the Southern District.  It's not clear to me by the way it's formulated whether it's actually serving as lead plaintiff in one of those

8AV4TEXC

or it just sought to be and was unsuccessful.

MR. ALBA:  In *Greenfield Online*, that case has been settled, and *Arbitron* is currently ongoing.  I believe the Plumbers were lead counsel in *Greenfield Online* and are lead counsel in *Arbitron*.  I will double check that for you.

THE COURT:  Am I correct that Plumbers held 17,500 shares as of November 26, 2007.

MR. ALBA:  Yes, your Honor.  As of the end of the class period, Plumbers did hold those shares.

THE COURT:  Who at Plumbers is going to supervise the litigation.

MR. ALBA:  Mr.  Morgan, chairman of the board, our client contact; we have certain climate contacts at the firm that deal with Mr. Morgan directly.

THE COURT:  Would you be lead counsel, you personally, at your law firm.

MR. ALBA:  If the New York office continues to work on the case, yes, my office along with myself and the lead partner Sam Rudman would be on the case.

THE COURT:  What does that mean, if the New York office.

MR. ALBA:  It's a rather large law firm as I am sure you are aware.  We have offices throughout the United States. We try to keep, the New York office tries to keep everything in the Southern District of New York because of our close

8AV4TEXC

proximity.  That will likely 99.9 percent happen here. However, in a large firm, we use the resources of all our offices.

THE COURT:  You are not a partner in the firm.

MR. ALBA:  No, I am not.

THE COURT:  Are you principal trial counsel on this case, you would be if Plumbers was lead plaintiff.

MR. ALBA:  If Plumbers was lead plaintiff I would be one of the counsel, along with Mr. Rudman who is the main partner in the firm, and Mr. Rosenfeld, a partner in the New York office as well.

THE COURT:  Why isn't one of those gentlemen here.

MR. ALBA:  Mr. Rosenfeld is Orthodox and doesn't like to travel on Fridays and I don't know were Mr. Rudman is not here today.

THE COURT:  Thank you.

So, that takes us to New Orleans.  As I understand it, New Orleans from their certification is currently serving as lead plaintiff in two litigations in the Southern District that are older lawsuits and that within the last three years, it applied to be lead plaintiff in two other lawsuits in the Southern District but did not succeed for whatever reason or I will just say was not appointed.

Do I have that right, counsel.

MR. FONTI:  Yes, you do, that is correct.  They are

8AV4TEXC

currently serving as lead plaintiff in *Celestica*, a matter before Judge Daniels.  The *Omnicom* matter goes back to 2002 is currently on appeal before the Second Circuit and was before Judge Pauley before that.

THE COURT:  On appeal at what stage.

MR. FONTI:  Summary judgment.

THE COURT:  Did it win or lose in the district court.

MR. FONTI:  Unfortunately it lost.

THE COURT:  On loss causation grounds.

MR. FONTI:  Yes, that's correct, your Honor.

Given your comments about New Orleans' loss in this case, the loss causation grounds for summary judgment were on a class-wide basis.  The class had been certified.  Judge Pauley found there was no loss causation for the entire class not merely for New Orleans.

THE COURT:  Probably the right away to approach it in a summary judgment motion in a class action.  And *Celestica*.

MR. FONTI:  The motions to dismiss are sub judice before Judge Daniels.  We are awaiting the outcome there.

THE COURT:  If New Orleans were chosen, who from New Orleans would be the person supervising this litigation.

MR. FONTI:  Specifically, it would be Jerome Davis, the chairman of the board there.  He is the person who also supervised the past litigations.  He was deposed at class cert in Omnicom and the class was in fact certified there.

He is now retired from the City of New Orleans.  He used to serve as employee representative on the board for the pension system.  He is an active speaker for institutional investors around the counsel and in fact around the world.  He takes these matters extremely seriously, both in the litigation context and in the context of educating board members on how to fulfill their fiduciary duties.

THE COURT:  Who would be, if New Orleans were chosen as lead plaintiff and your firm was accepted as counsel for lead plaintiff, who would be lead trial counsel on the case.

MR. FONTI:  Your Honor, I would in my view be the lead trial counsel.  Perhaps a more senior partner at the firm would also take part in that effort.  I have represented New Orleans since 2002 when I was at my prior firm and have now been representing New Orleans for the last two years in the *Celestica* matter at the Labaton firm.  I am very familiar with the client and their investment policies, practices, and they have expressed their confidence in my abilities personally.

THE COURT:  Your name is again.

MR. FONTI:  Joseph Fonti.

THE COURT:  I found you on the appearance sheet.

Thank you.

MR. FONTI:  Anything else, your Honor.

THE COURT:  That's it.

The first matter of business at today's conference is

to choose, in my mind the first matter of business is lead plaintiff, then to think about who will be their counsel, because it's hard to set a schedule for the case until we have that important work done first.  I am satisfied having heard everybody's presentation, having read all the papers submitted to me, and having reviewed as you can tell the trading history with counsel's help this morning, that it is appropriate in case to appoint the New Orleans Employees Retirement System as lead plaintiff in this case.

It's not my practice, unless there is a particular reason to do so that because of the complexities of the case or otherwise, to appoint more than one law firm as counsel for lead plaintiff.  So, I understand that the application on behalf of the Novagold Investor Group was supported by counsel from two law firms, but based on what I hear today, I would be appointing a single lead plaintiff, New Orleans Employees Retirement System, with one counsel, Labaton, as its attorney.

Before we move to the next phase of the case, is there anything else we need to address on this preliminary issue.

MR. ALBA:  Your Honor, you conceded before that Plumbers has a larger financial interest than New Orleans.  I would ask that they be considered as, I don't know, a co-lead or sole lead plaintiff.

THE COURT:  I have considered them and I believe that the application from New Orleans has been addressed with more

seriousness and preparation and that is an important function if you are going to represent the class here and if I can't count on counsel to be well-prepared and assist me in this litigation at this phase, I don't have the confidence that I need to have going forward.

So I am going to decline to appoint a group.  I don't see any reason to have a group.  I think an  artificial group really brings nothing to bear on this if I have an adequate lead plaintiff who is capable of performing the task of the lead plaintiff, supervising counsel and assisting in critical decisions including settlement and trial decisions where appropriate.

I know nothing about Mr. Textor or Mr. Page or not enough to make a judgment that would suggest that I should depart from what would be my regular practice and have colead plaintiffs.  I am satisfied that New Orleans' trading gives it an adequate stake in the litigation and does not render it vulnerable to attack, at least on grounds that are readily apparent at this stage when it comes to litigating a class certification motion.

So I have for counsel a document to use as a model for consolidation and case management, the initial case management order.  I will identify it.  It's available on our ECF system for everybody.  It's entered in the *Openwave* case, *Garfield v. Openwave* 07CV1309.  It's document number 39 in that litigation.

But I have a hard copy to present to you, Mr. Fonti.  Can you get me a proposed order for consolidation on Monday.

MR. FONTI:  Certainly, your Honor.

THE COURT:  So what we need to address now is a schedule for filing a consolidated amended complaint and then potentially a motion to dismiss schedule if defense counsel believe it would upon review of that complaint be appropriate to move for dismissal.  Mr. Fonti, how long to get me a consolidated amended pleading.

MR. FONTI:  We would like 60 days to do that. Obviously, the complaint will be subject to attack by the defendants on a number of grounds.  We want to be sure that we have the opportunity to fully investigate the matter and present allegations that will not only meet but exceed the standards in this circuit.

THE COURT:  I am going to give you until December 19. You will thank me for that.

MR. FONTI:  Yes.

THE COURT:  It gives you your holiday period.

MR. FONTI:  Thank you, your Honor; I do thank you for that.

THE COURT:  Any motion to dismiss, I will give you a little bit more time than 20 days, again because of the holiday period.  We will say January 23.  Opposition February 13. Reply February 20.  If there is not a motion to dismiss,

8AV4TEXC

Mr. Auspitz, can you write me a letter before January 23 if you are not going to move to dismiss, and I will set an immediate conference.

MR. AUSPITZ:  Yes, your Honor, we will do that.

THE COURT:  Great.  So assuming the case survives the motion to dismiss phase, I would be setting down a conference. At that conference, I would expect counsel to have consulted with each other and to come prepared to address an order or schedule for document production and have a sense about the scope of deposition practice and a schedule for that and expert discovery.  We would set at that initial conference a schedule going through those phases and probably for summary judgment as well.  I don't know that we would set a trial date at that initial conference; it would depend on what I heard.

Counsel, is there anything else we need to do on the record.

MR. FONTI:  Not from us, your Honor, no.

THE COURT:  Good.

I am going to close the record then for this case.

- - -