**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE EASTERLY ROCMUNI HIGH INCOME MUNICIPAL BOND FUND | 25-cv-6028 (DLC)<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page(s)**

I.    Summary of the Action ............................................................................................ 1

II.    Summary of Defendants' Violations of the Securities Laws .............................. 6

III.    Jurisdiction and Venue ........................................................................................ 8

IV.    The Parties ............................................................................................................ 8

    A.    Trust Defendants ....................................................................................... 8

    B.    Investment Advisor Defendants ............................................................... 9

    C.    Portfolio Manager Defendants ............................................................... 10

    D.    MPS Trust Officer and Trustee Defendants ........................................... 11

    E.    Easterly Trust Officer and Trustee Defendants ..................................... 12

    F.    Underwriter Defendants .......................................................................... 12

V.    Background and Facts ........................................................................................ 13

    A.    Background on the Fund .......................................................................... 13

    B.    The Municipal Bond Market ................................................................... 14

    C.    Disclosure Requirements for Open-End Mutual Funds .......................... 17

    D.    SEC Rules Limit Open-End Mutual Funds to No More Than 15% in Illiquid Assets ..................................................................................... 18

    E.    Factors Affecting the Liquidity of Municipal Bonds ............................. 19

    F.    The Fund's Valuation Standards ............................................................. 21

    G.    A Significant Portion of the Fund's Portfolio Was Invested in Illiquid Bonds .......................................................................................... 22

    H.    The Fund Materially Overstated the Value of its Assets and the Fund's NAV .......................................................................................... 27

    I.    The Fund Materially Overstated the Value of the Fund's Level 3 Assets ..................................................................................................... 35

J.      The Fund's Investment in Defaulted Bonds Was an Undisclosed
        Significant Investment Strategy of the Fund ...................................................... 37

K.      A Significant Portion of the Fund's Portfolio Was Invested in the
        Same or Related Businesses.................................................................................. 41

VI.   The Fund's Registration Statements and Prospectuses Contained Materially False
      and Misleading Statements ............................................................................................. 45

A.      The Registration Statements and Prospectuses Misrepresented the
        Fund's Compliance with the SEC's and the Fund's Limitation on
        Illiquid Investments ............................................................................................. 45

B.      The Registration Statements and Prospectuses' Misstatements
        Concerning Valuation ........................................................................................... 47

C.      The Registration Statements and Prospectuses Misrepresented the
        Fund's Investment Strategy Regarding Defaulted Securities .............................. 49

D.      The Registration Statements and Prospectuses Misrepresented the
        Fund's Significant Investment in the Same or Related Businesses ..................... 50

VII.  Class Action Allegations.................................................................................................. 51

VIII. Causes of Action .............................................................................................................. 53

Count I
Violations of Section 11 of the Securities Act (Against Defendants the MPS
Trust, the Easterly Trust, Eirich, Wiedmeyer,  Kern, Massart, Swanson, Rush,
Crate, Montague, Medugno, Spencer, Quasar Distributors and Easterly Securities)....... 53

Count II
Violations of Section 12(a)(2) of the Securities Act (Against Defendants the MPS
Trust, the Easterly Trust, Quasar Distributors and Easterly Securities) .......................... 54

Count III
Violations of Section 15 of the Securities Act (Against Defendants Eirich,
Wiedmeyer, Kern, Massart, Swanson, Rush, Crate, Montague, Medugno,
Spencer, the Portfolio Manager Defendants, Principal Street Partners and Easterly
Investment Partners) ........................................................................................................ 56

Count IV
Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 (Against
Defendants the Easterly Trust, Crate, Montague, Medugno and Spencer)...................... 57

Count V
Violation of Section 20(a) of the Exchange Act (Against Defendants Crate,
Montague, Medugno, Spencer and the Portfolio Manager Defendants) .......................... 59

IX.     Prayer for Relief...................................................................................................... 60

X.      Jury Trial Demanded............................................................................................... 60

Lead Plaintiff Richard Fulford ("Plaintiff"), by and through his undersigned counsel, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things: (i) a review of U.S. Securities and Exchange Commission ("SEC") filings by the James Alpha Funds Trust d/b/a Easterly Funds Trust (the "Easterly Trust") and the Managed Portfolio Series Trust (the "MPS Trust"); (ii) a review and analysis of other publicly available information, news articles, shareholder communications, and sales and marketing materials concerning the Easterly ROCMuni High Income Municipal Bond Fund (f/k/a the Principal Street High Income Municipal Fund) (the "Fund"); (iii) a review and analysis of other available materials relating to the Fund and the municipal bond market; and (iv) consultation with experts concerning economic loss and municipal bonds. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.

## I.      Summary of the Action

1.      This is a class action on behalf of all persons or entities who (i) during the period July 29, 2022 through June 12, 2025 (the "Class Period") purchased or otherwise acquired Class A, Investor Class or Institutional Class shares of the Fund (tickers: RMJAX, RMHVX, RMHIX, GSTFX, GSTEX, GSTAX), pursuant to or traceable to the Fund's registration statements and prospectuses and sustained damages; or (ii) held shares of the Fund as of September 30, 2024 and were entitled to vote on the reorganization of the Fund from a series of the MPS Trust into a series of the Easterly Trust.

2.      Defendants are **(i)** the Easterly Trust and the MPS Trust, which issued shares of the Fund on a continuous basis throughout the Class Period and are the registrants; **(ii)** Easterly Investment Partners LLC ("Easterly Investment Partners") and Principal Street Partners, LLC

("Principal Street Partners"), the Fund's current or former investment advisors; **(iii)** Troy E. Willis ("Willis") and Charlie S. Pulire ("Pulire"), the Fund's portfolio managers at all relevant times (the "Portfolio Manager Defendants"); **(iv)** Benjamin J. Eirich ("Eirich"), Treasurer of the MPS Trust, Brian R. Wiedmeyer ("Wiedmeyer"), President of the MPS Trust, and Robert J. Kern ("Kern"), David A. Massart ("Massart"), David M. Swanson ("Swanson"), and Leonard M. Rush ("Rush"), each a Trustee of the MPS Trust; **(v)** Darrell Crate ("Crate"), President and Chairperson of the Easterly Trust, Michael J. Montague ("Montague"), the Treasurer and principal financial officer of the Easterly Trust, and Neil Medugno ("Medugno") and A. Clayton Spencer ("Spencer"), each a Trustee of the Easterly Trust; and **(vi)** Quasar Distributors, LLC ("Quasar Distributors") and Easterly Securities LLC ("Easterly Securities"), the Fund's current or former underwriters, (collectively, the "Defendants").

3.    Lead Plaintiff alleges (i) strict liability and negligence claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act") against Defendants for the registering, offering and selling shares of the Fund pursuant to materially false and misleading registration statements and prospectuses (defined below); and (ii) negligence claims under Section 14 and Rule 14a-9, and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Defendants Crate, Montague, Medugno, Spencer and the Easterly Trust.

4.    The Fund is an open-end mutual fund registered under the Investment Company Act of 1940 ("1940 Act") and the Securities Act. Throughout the Class Period, the Fund's primary investment objective was to provide current income exempt from regular federal income tax. The Fund invested at least 80% of its net assets in tax exempt debt securities. The Fund's secondary investment objective was to seek total return.

5.    According to the Fund's "Fact Sheet," it seeks to provide "long-term, yield-driven

total return relying mostly on fundamental credit analysis by building a diversified high-yield portfolio focusing on overlooked and under-appreciated sectors of the high-yield municipal bond market." The Fund compared its returns to the Bloomberg High Yield Municipal Bond Index.

6.     As a mutual fund the Fund is subject to an extensive regulatory framework designed to safeguard the investing public. A mutual fund must register as an investment company under the 1940 Act and a fund's shares offered and sold to the public must be registered under the Securities Act. Mutual funds must file periodic reports with the SEC, provide enhanced disclosures to mutual fund investors concerning the Fund's principal investment strategies and risks, act in the best interests of investors, and implement risk management and operational controls and procedures. A mutual fund's shares must be priced daily based on the fund's net asset value ("NAV"), and under SEC rules and regulations, an open-end mutual fund may not hold more than 15% of its assets in illiquid securities in order to ensure investor redemption requests can be satisfied.

7.     In its registration statements and prospectuses filed with the SEC, the Fund misstated and inaccurately described its principal investment strategies, as well as the allocation and nature of its investment portfolio. These misrepresentations concealed the Fund's exposure to significant risks arising from a portfolio in which a substantial portion of its assets were illiquid securities and defaulted securities, and were materially overvalued.

8.     When these risks were ultimately disclosed, the Fund's NAV and the value of its portfolio of securities declined dramatically. The consequences for investors were severe: the Fund's shares lost more than 50% of their value.

9.     On June 13, 2025, fund investors were shocked when the Fund's NAV collapsed to $4.33 per share, a decline of over 30% from the reported NAV on June 12, 2025 of $6.15 per

share.[1]  In sharp contrast to the Fund's performance on June 13, 2025, the Fund's benchmark, the

Bloomberg High Yield Municipal Bond Index was flat, indicating that the massive NAV decline

was unique to the Fund rather than attributable to general market conditions.

      10.     On June 17, 2025, *Bloomberg* published a story titled "Easterly High Yield Muni

Fund Plunges Nearly 50% in Sales Dump" that stated the following:

> Easterly Funds' high-yield municipal-bond fund has dropped almost 50% since
> Friday as the portfolio unloaded illiquid securities from the riskiest part of the muni
> market, according to people familiar with the matter.

> The Easterly RocMuni High Income Municipal Bond Fund net-asset value fell to
> $3.16 on Monday from $6.15 on Friday morning. Its assets have declined to about
> $67 million from about $245 million at the end of February. . . .



**Easterly High-Yield Muni Fund Plunges**
Net-asset value of the Easterly RocMuni High Income Municipal Bond Fund

Source: Bloomberg

> Easterly's high-yield muni portfolio is stuffed with debt issued for biofuel projects,
> recycling facilities and retirement homes, according to data compiled by
> Bloomberg. Those kinds of credits rarely trade, making price discovery spotty.

> Birch Creek Capital, in its weekly muni commentary, referred to a spate of selling
> from a fund that included a large portion of distressed securities, limiting the buyer
> pool. . .

      11.     On June 18, 2025, *The Bond Buyer* published a story titled "Easterly HY muni fund

sells off, distressed credit trades for pennies" that stated the following:

---

[1] On or around June 17, 2025, the Fund revised the June 13, 2025 redemption price per share of
the Fund to $3.99 per share.

The Easterly RocMuni High Income Municipal Bond Fund's total net assets dropped to $49.9 million as of Tuesday down from $232 million as of March 31, as the fund floated large bid lists to potential buyers across the market.

The NAV was at $6.36 at the start of the month, falling to $6.15 by Thursday and then tumbling downward to $3.10 on Tuesday. The fund's performance year-to-date is negative 54.08%. . .

The large selloff is a rare occurrence in the high-yield market, and the rock-bottom prices show the risks of a high-yield market where liquidity is famously limited, market participants said. . .

Some of the credits represent high-profile defaults and distress across the market: Legacy Cares, the Proton International Alabama, LLC, and Ohio's Purecycle Technologies.

On Friday, an investor paid two cents for $800,000 of the Alabama proton center bonds with a 6.85% coupon and 2047 maturity, according to Electronic Municipal Market Access. The most recent trade before that was in 2021, for 114.

A buyer on Monday bought $2.6 million of Purecycle bonds with a 7% coupon due in 2042 for 50 cents on the dollar. The bonds traded in February 2024 for 102.

A $3.2 million chunk of bonds issued for borrower Gladieux Metals Recycling LLC sold Monday for 4 cents. The paper carries a 9% coupon. It last traded for 102 in April 2023. The Gladieux paper, which has been in default for years, was listed as the fund's top position at the end of the first quarter.

The credit information on many muni-financed project finance deals like Gladieux is hidden behind data rooms, accessible only to holders, so it's difficult to know what is happening with the credits. Recoveries on such projects are typically minimal.

The rock-bottom prices show the risks of the high-yield muni market, where liquidity is limited, said Chad Farrington, co-head of municipal bond strategy at DWS Asset Management. That's especially true for small pieces. . .

12.    As of July 24, 2025, the date upon which this action was filed, the Fund's reported NAV was $2.94 per share, a decline in NAV per share of over 52% since June 12, 2025.

13.    As of December 4, 2025, the Fund's reported NAV was $2.94 per share, and the Fund reported approximately $12.4 million in net assets, a decline of approximately $167 million, or over 92%, since the end of the Class Period.

## II.    Summary of Defendants' Violations of the Securities Laws

14.    During the Class Period, the Fund offered and sold shares to investors on a continuous basis through the following registration statements and prospectuses:

i.    the Registration Statement filed by the MPS Trust with the SEC on Forms N-1A and 485BPOS on February 8, 2022, and the Prospectus and Summary Prospectus filed with the SEC on Form 497K on February 16, 2022 ("2/16/2022 Registration Statement");

ii.    the Registration Statement and Prospectus filed by the MPS Trust with the SEC on Forms N-1A and 485BPOS on December 28, 2022, and Summary Prospectus filed with the SEC on Form 497K on December 29, 2022 (with Prospectus and Summary Prospectus dated December 29, 2022), the Prospectus, as supplemented on January 19, 2023, filed with the SEC on Form 497 on January 19, 2023, and May 19, 2023 Statement of Additional Information supplement, filed with the SEC on Form 497 on May 19, 2023 ("12/28/2022 Registration Statement");

iii.    the Registration Statement and Prospectus filed by the MPS Trust with the SEC on Forms N-1A and 485BPOS on December 28, 2023, and Summary Prospectus filed with the SEC on Form 497K on January 1, 2024 (with Prospectus and Summary Prospectus dated December 29, 2023) ("12/28/2023 Registration Statement");

iv.    the Registration Statement and Prospectus filed by the Easterly Trust with the SEC on Forms N-1A and 485BPOS on August 29, 2024 ("8/29/2024 Registration Statement");

v.    the Registration Statement and Joint Proxy Statement/Prospectus filed by the Easterly Trust with the SEC on Form N-14 on July 1, 2024, as amended by Form N-14/A filed with the SEC on September 5, 2024, which incorporated by reference the 12/28/2023 Registration Statement and 8/29/2024 Registration Statement ("9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus");

6

      vi.     the Registration Statement and Prospectus filed by the Easterly Trust with the SEC on Forms N-1A and 485BPOS on October 4, 2024, and Summary Prospectus filed with the SEC on Form 497K on October 11, 2024 (with Prospectus and Summary Prospectus dated October 7, 2024) ("10/4/2024 Registration Statement"); and

      vii.     the Registration Statement and Prospectus filed by the Easterly Trust with the SEC on Forms N-1A and 485BPOS on December 30, 2024 and Summary Prospectus filed with the SEC on Form 497K on January 8, 2025 (with Prospectus and Summary Prospectus dated December 31, 2024) ("12/30/2024 Registration Statement").

15.    Furthermore, Defendants issued and distributed the following documents in connection with the continuous offering of shares of the Fund: (i) the semi-annual and annual reports of the Fund filed with the SEC on Form N-CSRS and N-CSR; (ii) monthly portfolio investment reports filed with the SEC on Forms NPORT-P and NPORT-P/A; (ii) the Fund's holdings reports available on the Fund's website; and (iii) the Fund's Fact Sheet, Tailored Shareholder Reports and other sales and marketing materials available on the Fund's website.

16.    The registration statements and prospectuses delineated above contained untrue statements of material fact, omitted to disclose material facts required to be stated in a registration statement, and omitted to disclose material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading, summarized as follows: (i) unknown to investors, the Fund failed to disclose that throughout the Class Period the Fund's illiquid investments were greater than 15% of its net assets; (ii) the Fund had materially overstated the value of the Fund's assets; (iii) the Fund's investment in defaulted securities was an undisclosed significant investment strategy; and (d) unknown to investors, the Fund had invested nearly 19% of the Fund's net assets in the environmental companies of a single developer.

17.    At the end of the Class Period, investors in the Fund experienced a significant decline in the NAV of their shares—a decline that was foreseeable and directly caused by the Fund's excessive overallocation to illiquid securities, defaulted securities, securities within the same or related businesses, and the material overvaluation of its holdings. This occurred when the Fund disclosed the concealed risks associated with these investments, causing the Fund's asset values to materially decline and, in turn, dramatically driving down the Fund's NAV.

### III.    Jurisdiction and Venue

18.    The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77i, 77o and Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a), 78t(a). This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act, 15 U.S.C. § 77v, and under 28 U.S.C. § 1331.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because several defendants maintain an office in this District and many of the practices complained of herein occurred in substantial part in this District.

20.    In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, and interstate telephone and internet communications.

### IV.    The Parties

21.    Plaintiff purchased shares of the Fund during the Class Period as set forth in the certification filed in *Fulford v. James Alpha Fund Trust d/b/a Easterly Funds Trust, et al*., No. 25-cv-6102 (DLC) (S.D.N.Y.), and was damaged thereby.

#### A.    Trust Defendants

22.    The MPS Trust offered and sold shares of the Fund during the Class Period through the 2/16/2022 Registration Statement, 12/28/2022 Registration Statement, and 12/28/2023

Registration Statement. The MPS Trust was organized as a Delaware statutory trust on January 27, 2011 and is registered with the SEC as an open-end management investment company. MPS Trust has its principal executive offices at 615 East Michigan Street, Milwaukee, WI 53202. The MPS Trust was the registrant for shares of the Principal Street High Income Municipal Fund and the issuer of Class A (GSTFX), Investor Class (GSTEX), and Institutional Class (GSTAX) shares, each a series of the MPS Trust.

23.    The Easterly Trust offered and sold shares of the Fund or solicited shareholder votes through (1) the 8/29/2024 Registration Statement: (2) the 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus; (3) the 10/4/2024 Registration Statement; and (4) the 12/30/2024 Registration Statement. The Easterly Trust is a Delaware statutory trust and is registered under the 1940 Act as an open-end management investment company. Easterly Trust maintains its principal executive offices at 515 Madison Avenue, New York, NY 10022. The Easterly Trust is the registrant for shares of the Easterly ROCMuni High Income Municipal Bond Fund and the issuer of Class A (RMJAX), Investor Class (RMHVX) and Class I (RMHIX) shares, each a series of the Easterly Trust.

### B.    Investment Advisor Defendants

24.    Defendant Principal Street Partners, a Delaware limited liability company, is the former investment advisor to the Fund. Principal Street Partners registered with the SEC as an investment adviser on or about September 30, 2016. Effective May 23, 2025, Principal Street Partners changed the name of the firm from Principal Street Partners, LLC to Calydon Capital, LLC and it maintains an office at 999 S. Shady Grove Road, Suite 106, Memphis, TN 38120. The MPS Trust entered into an investment advisory agreement with Principal Street Partners on behalf of the Fund. Principal Street Partners had overall supervisory responsibility for the general management and investment of the Fund's securities portfolio, was responsible for valuation of

the Fund's assets and managing liquidity under SEC rules and regulations, furnished the Fund with office space and certain administrative services, and provided most of the personnel needed to fulfill its obligations under the advisory agreement. For its services, the Fund paid Principal Street Partners a monthly management fee.

25.    Defendant Easterly Investment Partners, a Delaware limited liability company, is the current investment advisor to the Fund. Easterly Investment Partners, subject to the general supervision of the board of trustees of the Easterly Trust, is responsible for managing the Fund in accordance with its investment objective and policies, maintaining related records for the Fund, investing the Fund's assets in securities and other instruments, rendering investment advice and related services with respect to the assets of the Fund, valuing the Fund's assets, and managing liquidity under SEC rules and regulations. Easterly Investment Partners receives advisory fees for its management of the Fund. Easterly Investment Partners maintains its principal executive office at 138 Conant Street, Beverly, MA 01915. Easterly Investment Partners is registered with the SEC as an investment adviser. Easterly Investment Partners was founded in 2019 and is wholly owned by LE Partners Holdings LLC, a Delaware limited liability company, which is principally owned and controlled by Defendant Crate and is an indirect subsidiary of Easterly Asset Management L.P. The Easterly Trust entered into an investment advisory agreement with Easterly Investment Partners on behalf of the Fund.

### C.    Portfolio Manager Defendants

26.    Defendant Willis was at all relevant times the portfolio manager for the Fund and is a resident of Boca Raton, Florida. Defendant Willis was the Chief Investment Officer of Municipal Bond Strategies and a Senior Portfolio Manager for Defendant Principal Street Partners and serves in the same role at Defendant Easterly Investment Partners. Defendant Willis is responsible for the day-to-day management of the Fund and has been the portfolio manager of the

Fund since January 2021. Defendant Willis was previously a Vice President and Senior Portfolio Manager of municipal bond funds offered and sold by Oppenheimer Funds, Inc. and was named as a defendant in *In re: Oppenheimer Rochester Funds Group Securities Litigation*, MDL No. 230 (D. Colo.), a litigation that involved allegations of misstatements relating to the value of certain funds' assets and limitations on illiquid assets.

27.    Defendant Pulire was at all relevant times the portfolio manager for the Fund and is a resident of Honeoye, New York. Defendant Pulire was a Senior Portfolio Manager for Municipal Bond Strategies for Defendant Principal Street Partners and serves in the same role at Defendant Easterly Investment Partners. Defendant Pulire is responsible for the day-to-day management of the Fund and has been the portfolio manager of the Fund since March 2022.

### D.    MPS Trust Officer and Trustee Defendants

28.    Defendant Eirich maintains an office at 615 E. Michigan St., Milwaukee, WI 53202 and he signed the 2/16/2022 Registration Statement, 12/28/2022 Registration Statement and 12/28/2023 Registration Statement.

29.    Defendant Wiedmeyer maintains an office at 615 E. Michigan St., Milwaukee, WI 53202 and he signed the 2/16/2022 Registration Statement, 12/28/2022 Registration Statement and 12/28/2023 Registration Statement.

30.    Defendant Kern maintains an office at 615 E. Michigan St., Milwaukee, WI 53202 and he signed the 2/16/2022 Registration Statement, 12/28/2022 Registration Statement and 12/28/2023 Registration Statement.

31.    Defendant Massart maintains an office at 615 E. Michigan St., Milwaukee, WI 53202 and he signed the 2/16/2022 Registration Statement, 12/28/2022 Registration Statement and 12/28/2023 Registration Statement.

32.    Defendant Swanson maintains an office at 615 E. Michigan St., Milwaukee, WI

53202 and he signed the 2/16/2022 Registration Statement, 12/28/2022 Registration Statement and 12/28/2023 Registration Statement.

33.     Defendant Rush maintains an office at 615 E. Michigan St., Milwaukee, WI 53202 and he signed the 2/16/2022 Registration Statement, 12/28/2022 Registration Statement and 12/28/2023 Registration Statement.

**E.     Easterly Trust Officer and Trustee Defendants**

34.     Defendant Crate maintains an office at 515 Madison Avenue, 24th Floor, New York, NY 10022 and he signed the 8/29/2024 Registration Statement, 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus, the 10/4/2024 Registration Statement and 12/30/2024 Registration Statement.

35.     Defendant Montague maintains an office at 515 Madison Avenue, 24th Floor, New York, NY 10022 and he signed the 8/29/2024 Registration Statement, 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus, 10/4/2024 Registration Statement and 12/30/2024 Registration Statement.

36.     Defendant Medugno maintains an office at 515 Madison Avenue, 24th Floor, New York, NY 10022 and he signed the 8/29/2024 Registration Statement, 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus, 10/4/2024 Registration Statement and 12/30/2024 Registration Statement.

37.     Defendant Spencer maintains an office at 515 Madison Avenue, 24th Floor, New York, NY 10022 and she signed the 8/29/2024 Registration Statement, 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus, 10/4/2024 Registration Statement and 12/30/2024 Registration Statement.

**F.     Underwriter Defendants**

38.     Defendant Quasar Distributors maintains an office at 111 East Kilbourn Avenue,

Suite 2200, Milwaukee, WI 53202 and was the underwriter and distributor of the Fund shares offered or sold by the MPS Trust on a continuous basis. Defendant Quasar Distributors engaged in sales and marketing of the Fund. Quasar Distributors is an affiliate of Defendant Principal Street Partners.

39.    Defendant Easterly Securities maintains an office at 138 Conant Street, Beverly, MA 01915, and is the principal underwriter and distributor for the shares of the Fund offered or sold by the Easterly Trust on a continuous basis. Easterly Securities engaged in sales and marketing of the Fund. Easterly Securities is a registered broker-dealer and member of the Financial Industry Regulatory Authority, Inc. Easterly Securities is an affiliate of Defendant Easterly Investment Partners.

## V.    Background and Facts

### A.    Background on the Fund

40.    The Fund is an open-end mutual fund that is registered with the SEC under the Securities Act and 1940 Act. The Fund purportedly invested in tax exempt municipal securities including assets in debt securities that are rated below investment grade (or "junk bonds") or unrated securities issued by or on behalf of states and local governmental authorities throughout the U.S. and its territories.

41.    From 2017 through October 2024, the MPS Trust offered Class A (GSTFX), Investor Class (GSTEX), and Institutional Class (GSTAX) shares of the Fund.

42.    In or around September 5, 2024, Defendant Principal Street Partners proposed an agreement and plan of reorganization (the "Reorganization") through which the assets and liabilities of the Principal Street High Income Municipal Fund would be transferred into a corresponding newly-created series of the Easterly Trust, the Easterly ROCMuni High Income Municipal Bond Fund.

43.     The Reorganization was approved by shareholders, and on or around October 4, 2024, the Reorganization closed. Immediately after the closing of the Reorganization, investors owned shares of the Easterly ROCMuni High Income Municipal Bond Fund that were equal in total value to the total value of the shares of the Principal Street High Income Municipal Fund held immediately prior to the closing of the Reorganization.

44.     After the Reorganization, the Easterly Trust offered and sold Class A (RMJAX), Investor Class (RMHVX) and Class I (RMHIX) shares of the Fund. In conjunction with the Reorganization, Easterly Investment Partners became the new investment advisor to the Fund, replacing Principal Street Partners.

45.     According to a March 2025 Easterly Investment Partners Firm Brochure, in connection with the Reorganization "Easterly entered an agreement to lift out the Municipal Bond team, formerly of Invesco and Oppenheimer Funds Rochester, from Principal Street Partners." The "Municipal Bond team" included Defendants Willis and Pulire, the Fund's portfolio managers.

### B.     The Municipal Bond Market

46.     The U.S. municipal bond market plays an important role in financing states and municipalities. The market is highly fragmented with more than 50,000 municipal bond issuers and approximately one million municipal securities outstanding, compared to approximately 30,000 U.S. corporate bonds.

47.     The municipal bond market is also less liquid than the corporate and U.S. Treasury markets. Many municipal bonds trade infrequently. As of October 2025, the daily average trading volume of municipal bonds was $14.91 billion, in contrast to $58.6 billion for U.S. corporate bonds.

48.     Municipal securities are classified by sectors, with each sector having its own risk, supply, and demand characteristics. High-level sectors include general obligation bonds, which

are supported by the full faith and credit of the issuer, and revenue bonds, which are supported by specific revenue pledges.

49.    Subcategories of revenue bonds, each with unique risk characteristics, include water and sewer, housing, healthcare, and conduit financing. Further segmentation and more defined subsectors are required for healthcare (hospital, nursing, assisted living, drug rehabilitation) and conduit financings (airline, hospitality, recycling, waste-to-energy).

50.    A conduit financing occurs when a government entity issues tax-exempt bonds on behalf of a private entity to fund a specific project. The government acts as a "conduit" for the financing, but does not assume repayment responsibility. The private borrower and developer is fully responsible for paying back the debt. Municipal bonds issued in connection with conduit financing carry a greater risk than general obligation municipal bonds because they are backed by the private borrower's credit, not the government's taxing power, and therefore investors in these bonds take on the risk of the borrower and developer's financial health, not the issuer's.

51.    Secondary market trading in municipal bonds is limited, as the market is dominated by investors who tend to buy and hold. While all the coupons from a municipal bond are tax-free, the capital gains from trading a municipal bond are not. Hence, holding municipal bonds over a longer period can help reduce capital gains taxes.

52.    Historically, municipal bonds have had very low default rates. For example, as of November 2002, the 1, 5, and 10-year cumulative default rates for all Moody's-rated municipal bond issuers have been 0.0043%, 0.0233%, and 0.0420%, respectively.

53.    Secondary market trading of these buy-and-hold assets generally occurs in the over-the-counter ("OTC") market, rather than on a securities exchange.

54.    As of mid-2025, the total market size (par value) of municipal bonds was over $4

trillion in outstanding debt, compared to the U.S. corporate bond market, which was approximately $11.1 trillion in outstanding debt.

55.     There are significant differences between municipal bonds compared to other fixed income assets, such as U.S. government, corporate, and asset-backed securities. In general, bonds in the secondary municipal bond market are less liquid than their U.S. government and corporate bond counterparts. This is due to the municipal bond market having over 50,000 different issuers, and over one million different municipal bonds outstanding. These bonds have various term structures and quality. Many states, counties, cities, local governments and districts issue municipal bonds.

56.     In addition, for economic and community benefit, entities have been created at the state and local level, so-called "authorities," to issue bonds on behalf of corporate entities with goals of creating employment and or bolstering tax rolls. In general, frequent issuers of municipal bonds, such as states, large cities and counties, like New York City, Los Angeles, Miami, Chicago, Nassau County, NY, and Orange County, CA, enjoy deeper secondary market liquidity than smaller, infrequent issuers, such as some school districts, towns and cities.

57.     Unlike other fixed income markets, the municipal bond market has traditionally been dominated by retail investors due to tax exemption benefits of municipal bonds and their relative safety given historically low default rates. As of 2024, retail investors held nearly 66% of outstanding municipal bonds, 45% directly and approximately 21% through mutual funds.

58.     Trade volume for a new issue municipal bond typically is highest in the time period after the new issue has sold in primary market and decreases over time, reflective of the buy-and-hold nature of municipal bonds.

C.    **Disclosure Requirements for Open-End Mutual Funds**

59.    SEC Form N-1A is used for the registration of securities under the Securities Act and 1940 Act for open-end management investment companies, like the Fund. 17 C.F.R. § 239.15A. Registered investment companies must amend their Form N-1A registration statement annually. 17 C.F.R. § 270.8b-16. Form N-1A sets forth the information required to be disclosed in a prospectus.

60.    According to the SEC, the disclosures required by SEC Form N-1A are intended to help prospective investors by requiring clear, easy-to-understand disclosure of a fund's characteristics and risks, with information presented to help investors evaluate them through a prospectus, and statement of additional information ("SAI"), which is part of the prospectus.

61.    The SEC requires a fund's prospectus to clearly disclose the fundamental characteristics and investment risks of the fund. The prospectus disclosure requirements are intended to elicit information for an average or typical investor who may not be sophisticated in legal or financial matters.

62.    The prospectus should help investors to evaluate the risks of an investment and to decide whether to invest in a fund by providing a balanced disclosure of positive and negative factors. Disclosure in the prospectus should provide information necessary to enable an average or typical investor to understand the particular characteristics of the fund, and to assist an investor in comparing and contrasting the fund with other funds. The prospectus should avoid simply restating legal or regulatory requirements to which funds generally are subject.

63.    The SEC requires a prospectus to disclose a fund's principal investment strategies. A strategy includes any policy, practice, or technique used by the fund to achieve its investment objectives. Whether a particular strategy is a principal investment strategy depends on the strategy's anticipated importance in achieving a fund's investment objectives, and how the strategy

17

affects the fund's potential risks and returns. A principal investment strategy is determined by considering the amount of a fund's assets expected to be committed to the strategy, the amount of a fund's assets expected to be placed at risk by the strategy, and the likelihood of the fund losing some or all of those assets from implementing the strategy. Furthermore, the SEC requires disclosure of any policy that is a principal investment strategy of a fund.

64.     The SEC further requires disclosure of the principal risks of investing in a fund, including the risks to which a fund's particular portfolio as a whole is expected to be subject and the circumstances reasonably likely to affect adversely a fund's NAV, yield, or total return.

> **D.     SEC Rules Limit Open-End Mutual Funds to No More Than 15% in Illiquid Assets**

65.     A hallmark of open-end mutual funds, like the Fund, is that they must be able to convert some portion of their portfolio holdings into cash on a frequent basis because they issue redeemable securities.

66.     Unlike publicly traded stocks, whose price is determined through trading on an exchange, mutual fund shares must be priced daily based on the fund's NAV. Investors purchase shares from the fund and generally must be able to freely redeem their shares with the fund. Investors in mutual funds can redeem their shares on each business day and by law must receive approximately their pro rata share of the fund's net assets or its cash value within seven calendar days after receipt of a redemption request.

67.     Accordingly, because open-end funds hold themselves out at all times as being prepared to meet these redemption requirements, they have a responsibility to manage the liquidity of their investment portfolios in a manner consistent with those obligations and are subject to various investment restrictions. Fund liquidity and liquidity management are important to reducing the risk that a fund will be unable to meet its obligations to redeeming shareholders while

minimizing the impact of those redemptions on the Fund, *i.e.*, mitigating investor dilution.

68.     There can be significant adverse consequences to remaining investors in a fund that does not adequately manage liquidity. A fund with significant holdings of illiquid securities may have to engage in sales on short notice to meet redemption obligations which could result in a fund receiving less than the carrying value of the illiquid securities. That would, in turn, result in a preference in favor of the redeeming shareholder, and a material negative affect on the fund's NAV and a diminution of the NAV per share for shareholders who have not redeemed.

69.     Thus, SEC regulations contain a liquidity standard that limits an open-end fund's aggregate holdings of "illiquid assets" to no more than 15% of the fund's net assets. 17 C.F.R. § 270.22e-4.

70.     Under the SEC's rule, a portfolio security or other asset is considered illiquid if it cannot be sold or disposed of in the ordinary course of business within seven days at approximately the value at which the fund has valued the investment.

### E.    Factors Affecting the Liquidity of Municipal Bonds

71.     Various factors and attributes of a municipal bond affect its liquidity.

72.     *High Value Denominations Limit Liquidity*. The vast majority of municipal bonds are denominated with a face value in the $5,000-$25,000 range, reflecting that this market substantially involves retail investors. Certain municipal bonds are issued with face value of $100,000 or higher, which significantly limits the universe of potential buyers to sophisticated institutional investors which limits trading, and therefore has a negative effect on liquidity.

73.     *Unrated Bonds Are Less Liquid.* Municipal bonds that are rated by a Nationally Recognized Statistical Ratings Organization (NRSRO), such as Moody's, S&P, and Fitch, enjoy deeper demand, and therefore, liquidity. Many municipal bonds are not rated by any NRSRO. A municipal bond issuer that has a good credit profile may nevertheless abstain from paying for a

rating to avoid the cost. As a result, many investors will not buy a non-rated bond because they cannot or do not have the ability to assess the credit risk. Also, many investment grade municipal bond funds cannot buy non-rated bonds. Therefore, non-rated bonds do not have the depth of liquidity of rated bonds.

74.    *Securities with Restrictions on Resale Limit Liquidity*. Securities issued in unregistered, private offerings cannot be freely resold without registration with the SEC or an exemption. Restricted securities include securities sold under Rule 144A of the Securities Act, which provides a safe harbor from Securities Act registration requirements for qualifying sales to institutional investors. In general, municipal bonds issued only for qualified investors under Rule 144A are non-rated. Securities under Rule 144A are issued in minimum denominations of $100,000, which is appropriate only for high net-worth and institutional investors. Given these limitations, the market for 144A securities is limited compared to registered and rated bonds, and therefore, they are less liquid.

75.    *Restricted Access to Offering Information and Bond Performance Limits Liquidity.* The degree of access to information concerning the offering documents and performance of a municipal bond affects its liquidity. Information about a municipal bond is critical, especially where the bond is non-performing, or defaulted. When researching a potential non-rated bond to buy, potential buyers require access to secondary market disclosure, *i.e.*, information about the ability of the credit to repay what it owes. When this data is restricted to only the existing bondholder group, such as behind a confidential data room accessible only to current bond holders, it has the effect of limiting the number of willing participants to purchase that security because potential investors are unable to assess credit risk. Therefore, limitations on access to information needed to assess the creditworthiness of a bond negatively impacts its liquidity.

76.    *Market Makers Avoid Municipal Bonds Held by Mutual Funds Which Reduces Liquidity.* Since the Covid-19 pandemic, bond dealers—who broker over-the-counter sales of municipal bonds—have been reluctant to hold inventory in bonds held by mutual funds due to increased risk and difficulty of finding buyers in a retail-dominated market during times of heavy redemptions. The reduction in dealer inventory of bonds held by mutual funds lessens their ability to make a market in these securities and decreases a municipal bond fund's ability to buy or sell bonds, which negatively impacts liquidity.

77.    Accordingly, if a fund needs to sell bonds with some or all of these attributes of illiquidity, a fund will be faced with a scarcity of potential buyers and the absence of a deep, orderly market.

**F.    The Fund's Valuation Standards**

78.    The Fund's board of trustees designated Defendants Principal Street Partners or Easterly Investment Partners to perform all of the Fund's fair value determinations.

79.    The Fund adopted fair value accounting standards and the hierarchy for measuring fair value under three levels:

Level 1 – Unadjusted quoted prices in active markets for identical assets or liabilities that the Funds have the ability to access.

Level 2 – Observable inputs other than quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly. These inputs may include quoted prices for the identical instrument on an inactive market, prices for similar instruments, interest rates, prepayment speeds, credit risk, yield curves, default rates and similar data.

Level 3 – Unobservable inputs for the asset or liability, to the extent relevant observable inputs are not available, representing the Funds' own assumptions about the assumptions a market participant would use in valuing the asset or liability and would be based on the best information available.

80.    The Fund's Level 2 assets are valued by a pricing service, which Defendants Principal Street Partners and Easterly Investment Partners were responsible for overseeing under

SEC rules and regulations.

81.    However, determinations of the fair value of the Fund's Level 3 assets were made by Defendants Principal Street Partners and Easterly Investment Partners. Level 3 assets are highly illiquid, and there generally is no readily available market data to determine their value.

### G.    A Significant Portion of the Fund's Portfolio Was Invested in Illiquid Bonds

82.    Throughout the Class Period, the Fund's holdings of illiquid securities exceeded more than 15% of its net assets. The credit quality, structure and performance of the following bonds that the Fund held throughout the Class Period embody illiquid bonds—they were unrated securities, thinly traded or not traded, held by a small group of bondholders, restricted 144A securities, issued in denominations of over $100,000, and information concerning their respective performance was restricted to confidential data rooms available only to the Fund and other holders of the bonds:

| CUSIP[2] | Name of Issuer/Obligor | The Fund's Percentage Ownership as of May 31, 2025 (% of Face Value) |
|---|---|---|
| 03469KAA1 | Angelina and Neches River Authority Industrial Development Corporation Solid Waste Disposal and Wastewater Treatment Facilities Revenue Bonds (Obligor: Jefferson Enterprise Energy, LLC Project) Series 2020 (TX) ("Series 2020 Jefferson Enterprise Energy, LLC Project") | 54% of $22 million bond offering |

---

[2] CUSIP is an acronym for the Committee on Uniform Security Identification Procedures. The CUSIP Service Bureau, operated by Standard & Poor's, administers this system and assigns unique numbers (CUSIP numbers) and standardized descriptions of securities. A company is required to obtain a CUSIP number in connection with a registered offering and certain types of unregistered offerings (such as a Rule 144A offering and a Regulation S offering). Each security issued by a company has its own CUSIP number, which is a nine-digit identifier composed of both numbers and letters. Typically all securities issued by the same issuer have the same first six digits; the last three digits represent the specific type of security.

| CUSIP[2] | Name of Issuer/Obligor | The Fund's Percentage Ownership as of May 31, 2025 (% of Face Value) |
|---|---|---|
| 049610AA6 | Atoka City Industrial Development Authority Solid Waste Disposal Facilities Revenue Bonds (AMT) (Obligor: Gladieux Metals Recycling Oklahoma, LLC Project) Series 2019 (OK) ("Series 2019 Gladieux Metals Recycling Oklahoma, LLC Project") | 27.6% of $25 million bond offering |
| 049610AB4 | Atoka City Industrial Development Authority Solid Waste Disposal Facilities Revenue Bonds (Obligor: Gladieux Metals Recycling Oklahoma, LLC Project) Additional Series 2019A (OK) ("Series 2019A Gladieux Metals Recycling Oklahoma, LLC Project") | 25% of $3 million bond offering |
| 10604PAA1 | Brazoria County Industrial Development Corporation Solid Waste Disposal Facilities Revenue Bonds (Obligor: Gladieux Metals Recycling, LLC Project) Series 2019 (TX) ("Series 2019 Gladieux Metals Recycling, LLC Project") | 16.4% of $25 million bond offering |
| 10604PAB9 | Brazoria County Industrial Development Corporation Solid Waste Disposal Facilities Revenue Bonds (Obligor: Gladieux Metals Recycling, LLC Project) Additional Series 2019A (TX) ("Series 2019A Gladieux Metals Recycling, LLC Project") | 12.9% of $25 million bond offering |
| 10604PAC7 | Brazoria County Industrial Development Corporation (Obligor: Gladieux Metals Recycling, LLC Project) Texas Solid Waste Disposal Facilities Revenue Bonds Additional Series 2019B (TX) ("Series 2019B Gladieux Metals Recycling, LLC Project") | 2.4% of $50 million bond offering |
| 306767AA2 | City of Falmouth, Kentucky Solid Waste Disposal Facilities Revenue Bonds (Obligor: Texas Bluegrass Biofuels, LLC Project) Series 2020 (KY) ("Series 2020 Texas Bluegrass Biofuels, LLC Project") | 44.4% of $20 million bond offering |
| 47353PAA6 | Jefferson County Industrial Development Corporation Industrial Development Revenue Bonds (Obligor: TRP Crude Marketing, LLC Project) Series 2019 (TX) ("Series 2019 TRP Crude Marketing, LLC Project") | 9% of $10 million bond offering |
| 500726AA2 | Kountze Economic Development Corporation Industrial Development Revenue Bonds (Obligor: Allegiant Industrial, LLC Project) Series 2017 (TX) ("Series 2017 Allegiant Industrial, LLC Project") | 50.6% of $8.6 million bond offering |

| CUSIP[2] | Name of Issuer/Obligor | The Fund's Percentage Ownership as of May 31, 2025 (% of Face Value) |
|---|---|---|
| 73360CAB0 | Port of Beaumont Navigation District of Jefferson County, Texas Dock and Wharf Facility Revenue Bonds (Obligor: Allegiant Industrial Island Park Project) Series 2019 (TX) ("Series 2019 Allegiant Industrial Island Park Project") | 28% of $25 million bond offering |
| 95649CAA8 | West Virginia Economic Development Authority Dock And Wharf Facilities Revenue Bonds (Obligor: Empire Trimodal Terminal, LLC Project) Series 2020 (WV) ("Series 2020 Empire Trimodal Terminal, LLC Project") | 24.6% of $26 million bond offering |

83.    These illiquid bonds consistently represented a significant percentage of the Fund's net assets throughout the Class Period:

| Date | 8/31/22 | 8/31/23 | 11/30/23 | 8/31/24 | 2/28/25 | 5/31/25 |
|---|---|---|---|---|---|---|
| Fund NAV | $293.7mm | $274.0mm | $268.6mm | $336.4mm | $244.0mm | $180.3mm |
| Fund Valuation of Bonds | $52.9mm | $50.2mm | $50.1mm | $50.5mm | $41.6mm | $39.3mm |
| % of NAV represented | 18.00% | 18.32% | 18.65% | 15.01% | 17.05% | 21.80% |

84.    On or around June 13, 2025, the Fund sold these bonds at prices materially lower than the Fund's valuation during the Class Period, demonstrating that these bonds were illiquid:

| Name of Issuer/Obligor | Fund Value as of 5/31/25 | Actual Value Based on the Fund's June 2025 sale |
|---|---|---|
| Series 2020 Jefferson Enterprise Energy, LLC Project (CUSIP: 03469KAA1) | $3,944,979, 33% of reported face value held | $238,000, 2% of face value held |
| Series 2019 Gladieux Metals Recycling Oklahoma, LLC Project (CUSIP: 049610AA6) | $5,520,000, 80% of reported face value held | $207,690, 3% of face value held |

| Name of Issuer/Obligor | Fund Value as of 5/31/25 | Actual Value Based on the Fund's June 2025 sale |
|---|---|---|
| Series 2019A Gladieux Metals Recycling Oklahoma, LLC Project (CUSIP: 049610AB4) | $600,000, 80% of reported face value held | $22,575, 3% of face value held |
| Series 2019 Gladieux Metals Recycling, LLC Project (CUSIP: 10604PAA1) | $3,292,000, 80% of reported face value held | $206,162, 5% of face value held |
| Series 2019A Gladieux Metals Recycling, LLC Project (CUSIP: 10604PAB9) | $2,572,000, 80% of reported face value held | $128,922, 4% of face value held |
| Series 2019B Gladieux Metals Recycling, LLC Project (CUSIP: 10604PAC7) | $968,000, 80% of reported face value held | $48,521, 4% of face value held |
| Series 2020 Texas Bluegrass Biofuels, LLC Project (CUSIP: 306767AA2) | $6,212,500, 70% of reported face value held | $267,138, 3% of face value held |
| Series 2019 TRP Crude Marketing, LLC Project (CUSIP: 47353PAA6) | $765,000, 85% of reported face value held | $9, 0.001% of face value held |
| Series 2018 Allegiant Industrial, LLC Project (CUSIP: 500726AA2) | $4,132,500, 95% of reported face value held | $271,875, 6.25% of face value held |
| Series 2019 Allegiant Industrial Island Park Project (CUSIP: 73360CAB0) | $6,309,000, 90% of reported face value held | $438,125, 6.25% of face value held |
| Series 2020 Empire Trimodal Terminal, LLC Project (CUSIP: 95649CAA8) | $4,954,472, 77% of reported face value held | $624,000, 9.75% of face value held |

85.     As of May 31, 2025, the Fund valued these securities at $39.3 million and, just two weeks later, the Fund sold them all for approximately $2.3 million, a decline in value of over 94%.

86.     Other illiquid bonds held by the Fund that were sold after the end of the Class Period at prices materially lower than the Fund's valuation include the following:

| Name of Issuer/Obligor | Fund Value as of 5/31/25 | Actual Value based on the Fund's June 2025 sale |
|---|---|---|
| West Virginia Economic Development Authority (Obligor: Entsorga West Virginia) (CUSIP: 95648VBD0) | $800,000, 80% of face value held | $10, 0.01% of face value held |
| South Carolina Jobs-Economic Development Authority (Obligor: Repower S. Berkeley) (CUSIP: 83704DAB2) | $90,000, 9% of face value held | $10, 0.01% of face value held |
| South Carolina Jobs-Economic Development Authority (Obligor: Jasper Pellets) (CUSIP: 83704DAF3) | $354,000, 23.6% of face value held | $15, 0.01% of face value held |
| Wisconsin Public Finance Authority (Obligor: Proton International Alabama LLC) (CUSIP: 74442PEV3) | $40,000, 10% of face value held | $7,000, 1.75% of face value held |
| Legato Community Authority (CUSIP: 52473TAF2) | $1,970,408, 98.52% of face value held | $1,031,220, 51.56% of face value held |
| Grandview Reserve Metropolitan District No. 3 (CUSIP: 386810AA3) | $1,416,678, 94.45% of face value held | $1,046,250, 69.75% of face value held |
| Grandview Reserve Metropolitan District No. 3 (CUSIP: 386810AB1) | $1,003,943, 100.39% of face value held | $497,500, 49.75% of face value held |
| Sierra Vista Industrial Development Authority (Obligor: Georgetown Community Development Authority) (CUSIP: 82652PAB9) | $1,256,541, 83.77% of face value held | $791,250, 52.75% of face value held |
| South Carolina Jobs-Economic Development Authority (Obligor: AAC East) (CUSIP: 837031YR8) | $2,882,492, 82.36% of face value held | $345,625, 9.88% of face value held |
| Children's Trust Fund (CUSIP: 16876QBM0) | $6,776,388, 5.65% of face value held | $2,850,000, 2.38% of face value held |

| Name of Issuer/Obligor | Fund Value as of 5/31/25 | Actual Value based on the Fund's June 2025 sale |
|---|---|---|
| New York Counties Tobacco Trust IV (CUSIP: 62947YAK7) | $2,816,795, 5.63% of face value held | $1,187,500, 2.38% of face value held |

87.    The Fund's sale on or around June 13, 2025 of a substantial amount of its securities at prices significantly lower than the Fund's valuation is the realization of the undisclosed illiquidity risk, and revealed that liquidity for more than 15% of the Fund's securities was scarce and that a readily available market of buyers did not exist for these securities.

88.    In addition to the illiquid bonds delineated above, the Fund's reported Level 3 assets, which are illiquid, as a percentage of net assets was as high as 16%:

| Date | 8/31/22 | 8/31/23 | 11/30/23 | 8/31/24 | 2/28/25 | 5/31/25 |
|---|---|---|---|---|---|---|
| Fund NAV | $293.7mm | $274.0mm | $268.6mm | $336.4mm | $244.0mm | $180.3mm |
| Value of Level 3 Assets | $9.5mm | $33.4mm | $43.2mm | $18.2mm | $25.0mm | $23.2mm |
| % of NAV Represented | 3.23% | 12.19% | 16.08% | 5.41% | 10.25% | 12.87% |

**H.    The Fund Materially Overstated the Value of its Assets and the Fund's NAV**

89.    The price of shares of a fund is called its "net asset value" or "NAV" and is based on the value of a fund's investments. The NAV per share of the Fund was determined once daily at the close of trading on the New York Stock Exchange. Proper valuation, among other things, promotes the purchase and sale of fund shares at fair prices, and helps to avoid dilution of shareholder interests. Improper valuation can cause investors to pay fees that are too high or to base their investment decisions on inaccurate information.

90.    The Fund's board of trustees approved the use of bond pricing services for the valuation of each Fund's debt securities after the close of business each trading day. However, the designation of a pricing service is subject to the board's oversight.

91.    Unknown to investors, the pricing service relied upon by the Fund to determine the valuation of its securities was materially deficient and provided valuations for a material number of the Fund's securities that were materially overstated.

92.    The pricing service's deficiencies and the Fund's reliance on it created the risk that the Fund could not sell the securities in the Fund at the prices established by the pricing service and that such risk could (and, in fact, did) lead to material losses for Fund investors.

93.    For example, the registration statement and prospectuses did not disclose the risk that pricing services generally price municipal bonds assuming orderly transactions of an institutional "round lot" typically over $1,000,000 in face value and ignore trades that occur in smaller "odd lot" sizes, even though an executed market transaction is concrete and persuasive evidence of value, *i.e.*, what a buyer is willing to pay for the security.

94.    Evidence of this material deficiency is reflected by the stark contrast between the Fund's valuation of its assets compared to market transactions at prices significantly lower than the Fund's valuations.[3]

### i.    Series 2020 Jefferson Enterprise Energy, LLC Project (CUSIP: 03469KAA1)

95.    On December 10, 2024, the Series 2020 Jefferson Enterprise Energy, LLC Project bond reported a monetary default.

---

[3] The market data is reported through the Electronic Municipal Market Access ("EMMA"). EMMA is funded and operated by the MSRB, the self-regulatory organization charged by Congress with promoting a fair and efficient municipal securities market. EMMA is designated by the SEC as the official source for municipal securities data and disclosure documents.

96.     On April 2, 2025, there were four trades in this bond with a total face value of $1,150,000, three trades of $350,000 in face value at $7.50 per $100 of face value, and one trade of $100,000 at $7.65 per $100 of face value, indicating the market valued these bonds at 7.5-7.65 cents on the dollar.

97.     In the Fund's Monthly Portfolio Investment Report for the period ended May 31, 2025, the Fund valued its $11,900,000 position at $3,994,979, or $33.15 per $100 face value, a valuation over 333% higher than the April 2, 2025 market transactions.

98.     On June 13, 2025, two weeks after the Fund's May 31, 2025 Monthly Portfolio Investment Report, the Fund sold its position for 2 cents on the dollar.

> **ii.     Series 2019 and 2019A Gladieux Metals Recycling Oklahoma, LLC Project (CUSIPs: 049610AA6, 049610AB4)**

99.     On November 7, 2024, the Series 2019 Gladieux Metals Recycling Oklahoma, LLC Project and Series 2019A Gladieux Metals Recycling Oklahoma, LLC Project bonds reported a monetary default. These bond issuers share the same obligor, Gladieux Metals Recycling Oklahoma, LLC Project.

100.    On April 2, 2025, there were four trades in CUSIP 049610AA6, one trade of $100,000 in face value traded for $8.70 per $100 face value, and three trades of $375,000 in face value traded at $8.50 per $100 in face value, indicating the market valued these bonds at 8.5-8.7 cents on the dollar.

101.    In the Fund's Monthly Portfolio Investment Report for the period ended May 31, 2025, the Fund valued its total position in these bonds of $7,650,000 at $6,120,000, or $80 per $100 face value, a valuation over 819% higher than the April 2, 2025 market transactions.

102.    On June 13, 2025, two weeks after the Fund's May 31, 2025 Monthly Portfolio Investment Report, the Fund sold its position for 3 cents on the dollar.

### iii.    Series 2020 Texas Bluegrass Biofuels, LLC Project (CUSIP: 306767AA2)

103.    On December 16, 2024, the Series 2020 Texas Bluegrass Biofuels, LLC Project bond reported monetary defaults.

104.    On April 2, 2025, there were three trades of $290,000 in face value, traded for $8.50 per $100 face value, and one trade of $100,000 in face value traded at $8.50 per $100 in face value, indicating the market valued these bonds at 8.5-8.7 cents on the dollar.

105.    In the Fund's Monthly Portfolio Investment Report for the period ended May 31, 2025, the Fund valued its total position of $8,875,000 at $6,212,000, or $70 per $100 face value, a valuation over 704% higher than the April 2, 2025 market transactions.

106.    On June 13, 2025, two weeks after the Fund's May 31, 2025 Monthly Portfolio Investment Report, the Fund sold its position for 3 cents on the dollar.

### iv.    Series 2019 Allegiant Industrial Island Park Project (CUSIP: 73360CAB0)

107.    On July 26, 2024, Allegiant Industrial Island Park Project bondholders approved and directed the trustee to waive payment of principal and interest, which has the same effect as an event of default.

108.    On February 18, 2025, there were three trades of $100,000 in face value traded for $26.33 per $100 face value, indicating the market valued these bonds at 26.33 cents on the dollar.

109.    In the Fund's Monthly Portfolio Investment Reports for the period ended February 28, 2025 and May 31, 2025, the Fund valued its total position in this bond of $7,010,000 at $6,309,000, or $90 per 100 face value, a valuation over 241% higher than the February 18, 2025 market transactions.

110.    On June 13, 2025, two weeks after the Fund's May 31, 2025 Monthly Portfolio Investment Report, the Fund sold its position for 6.25 cents on the dollar.

v.    **Series 2019, Series 2019A and Series 2019B Gladieux Metals Recycling, LLC Project (Texas) (CUSIPs: 10604PAA1, 10604PAB9, 10604PAC7)**

111.    On September 11, 2024, Series 2019 Gladieux Metals Recycling, LLC Project, Series 2019A Gladieux Metals Recycling, LLC Project and Series 2019B Gladieux Metals Recycling, LLC Project bonds reported a monetary default. These bond issuers share the same obligor, Gladieux Metals Recycling, LLC Project.

112.    On January 14, 2025, there were two trades in Series 2019B Gladieux Metals Recycling, LLC Project of $290,000 in face value at $39.75-40.25 per $100 face value, indicating the market valued these bonds at approximately 40 cents on the dollar.

113.    In the Fund's Monthly Portfolio Investment Report for the periods ended February 28, 2025 and May 31, 2025, the Fund valued its total position in these bonds of $8,540,000 at $6,832,000, or $80 per 100 face value, a valuation over 100% higher than the January 14, 2025 market transactions.

114.    On June 13, 2025, two weeks after the Fund's May 31, 2025 Monthly Portfolio Investment Report, the Fund sold its position for 4-5 cents on the dollar.

115.    Additional evidence of the material pricing deficiencies and the Fund materially overstating the value of its securities as compared to market transactions for the same security is reflected by the following examples:

vi.    **Capital Trust Agency, Inc. (Obligor: Tallahassee NHHI)**

a.    **CUSIP: 14052WCH8, Face value held by the Fund: $150,000**



b.    **CUSIP: 14052WCJ4, Face value held by the Fund: $2,000,000**



**vii.    Capital Trust Agency, Inc. (Obligor: Tapestry Senior Housing Walden), CUSIP: 14052WCV7, Face value held by the Fund: $2,200,000**



**viii.   New Hope Cultural Education Facilities Finance Corp. (Obligor: Buckingham Senior Living Obligated Group), CUSIP: 64542UFR0, Face value held by the Fund: $2.295mm-2.413mm**



ix.    **Pennsylvania Economic Development Financing Authority (Obligor: Tapestry Moon), CUSIP: 70869PLY1, Face value held by the Fund: $2,950,000**



x.    **Indiana Finance Authority (Obligor: Brightmark Plastics Renewal), CUSIP: 45470DAA5, Face value held by the Fund: $5.96mm-7.86mm**



### xi. Lake County (Obligor: Village Veranda at Lady Lake Obligated Group), CUSIP: 50832PAB9, Face value held by the Fund: $5,800,000



116.    The material deficiencies of the Fund's valuation procedures for its securities were revealed on or around June 13, 2025 when the Fund sold a substantial amount of its assets at prices materially below the Fund's valuation. By materially overstating the value of certain of its municipal bond assets, the Fund thereby materially inflated the NAV that investors paid for shares of the Fund during the Class Period.

### I.    The Fund Materially Overstated the Value of the Fund's Level 3 Assets

117.    Whereas the Fund's pricing service furnished values for the Fund's Level 2 assets, the Fund's investment advisors, Easterly Investment Partners and Principal Street Partners valued the Fund's Level 3 assets. The Fund materially overstated the value of these assets and the Fund's valuation procedures were materially defective.

118.    In or around April 2023, the Fund acquired shares of Next Renewable Fuels, Series A 6% convertible preferred stock.

119.    The Fund's investment was related to a transaction announced on April 14, 2023 whereby Lakeview RNG, a wholly owned subsidiary of Next Renewable Fuels, purchased the assets of Red Rock Biofuels development in Oregon. Prior to this transaction, Red Rock Biofuels had been foreclosed in December 2022 with the property being sold at auction to satisfy obligations of Red Rock's trust deed. By April 2023, Red Rock Biofuels had failed to pay over $350 million in principal and interest on its economic development bonds.

120.    Given Red Rock Biofuels' financial condition, the value of the Fund's investment in Next Renewable Fuels, Series A 6% convertible preferred stock was dependent on Next Renewable Fuels closing a transaction to raise additional funds through a merger with a special purpose acquisition company ("SPAC").

121.    At or around the time of the Fund's investment in Next Renewable Fuels, Series A 6% convertible preferred stock, Next Renewable Fuels was seeking to go public through a SPAC merger in which holders of Next Renewable Fuels preferred stock would receive Series A Preferred Stock in the SPAC, Industrial Tech Acquisitions II ("ITAQ"). ITAQ was organized in November 2022 to purchase Next Renewable Fuels with proceeds from an IPO in which ITAQ raised approximately $176 million, valuing Next Renewable Fuels at $667 million.

122.    However, on April 10, 2023, approximately 92% of ITAQ's shareholders voted to redeem their stock in the company, causing its trust account and the cash it was expected to pay in the planned merger with Next Renewable Fuels to decline from $176 million to $14 million.

123.    On November 8, 2023, the merger between ITAQ and Next Renewable Fuels was terminated and ITAQ was liquidated.

124.    Despite these developments, the Fund continued to value its Next Renewable Fuels preferred stock (including accrued paid-in-kind dividends) at over $5 million and represented that

it expected 100% recovery, as follows:

| Date | Number of Shares | Fund Value |
|---|---|---|
| 11/30/23 | 6.778 | $5,083,502 |
| 2/29/24 | 6.778 | $5,083,502 |
| 5/31/24 | 6.778 | $5,083,502 |
| 8/31/24 | 7.177403 | $5,383,052 |
| 11/30/24 | 7.3953 | $5,546,475 |
| 2/28/25 | 7.5054 | $5,629,050 |
| 5/31/25 | 7.618 | $5,713,500 |

125.    As of May 31, 2025, Next Renewable Fuels, Series A 6% convertible preferred stock represented over 3% of the Fund's assets.

126.    After the Class Period, the Fund marked down the value of its shares of Next Renewable Fuels, Series A 6% convertible preferred stock by 100%, to $0.08, disclosed that the expected recovery was now 0%, and, in effect, admitted that these shares were worthless. In truth, since at least November 2023, the Fund had materially overstated the value of its investment in Next Renewable Fuels, Series A 6% convertible preferred stock.

**J.    The Fund's Investment in Defaulted Bonds Was an Undisclosed Significant Investment Strategy of the Fund**

127.    While the registration statements and prospectuses represented that the Fund's "Adviser does not expect" that investment in defaulted bonds would be "a significant investment strategy of the Fund[]," in fact, throughout the Class Period, a significant number of the Fund's securities were defaulted, and the Fund's investment in defaulted securities represented a significant portion of the Fund's assets, representing up to 35% of the Fund's assets and over $60 million in asset value, as depicted below:



128.    Throughout the Class Period a significant number of the Fund's securities were defaulted and the Fund's investment in defaulted securities was an undisclosed significant or principal investment strategy because it represented a significant portion of the Fund's assets, representing up to 35% of the Fund's total assets and over $60 million in asset value, and given the nature and quality of these securities, there was a very high likelihood of the Fund losing some or all of those assets from implementing this strategy.

129.    Moreover, the Fund failed to disclose all of its defaulted securities in its financial statements. SEC Regulation S-X sets forth the form and content of and requirements for financial statements required to be filed as part of a registration statement under the Securities Act, and registration statement and shareholder reports under the 1940 Act. Under Regulation S-X, the "facts and amounts concerning any default in principal, interest, sinking fund, or redemption provisions with respect to any issue of securities or credit agreements, or any breach of covenant

of a related indenture or agreement, which default or breach existed at the date of the most recent balance sheet being filed and which has not been subsequently cured, shall be stated in the notes to the financial statements. If a default or breach exists but acceleration of the obligation has been waived for a stated period of time beyond the date of the most recent balance sheet being filed, state the amount of the obligation and the period of the waiver." 17 C.F.R. § 210.4–08 (General notes to financial statements).

130.    The 2024 Semi-Annual Report failed to comply with the SEC's rule on disclosure of defaulted securities in the Fund's financial statements. For the following securities in the Fund's portfolio, there was no disclosure of default in the 2024 Semi-Annual Report's financial statements:

| Security Description | Fund Value as of 2/29/24 | Date and Nature of Default |
|---|---|---|
| Series B, 6.38%, 02/15/2041 (Obligor: CC Young Memorial Home) | $302,500 | February 14, 2024. Notice that interest would not be paid and that events of default had occurred and were continuing since 2022. |
| 8.75%, 02/01/2036 (Obligor: Entsorga West Virginia) | $800,000 | October 6, 2022. Events of default had occurred and were continuing. |
| Lake Country, Series A1, 7.13%, 01/01/2052 (Obligor: Village Veranda at Lady Lake Obligated Group) | $4,350,000 | September 30, 2022. Events of default had occurred under the bond documents, including, failure to make monthly payments. |
| 10.00%, 06/30/2024 (Obligor: Voans SW Florida Healthcare) | $7,552,500 | February 15, 2023. Project termination notice. May 13, 2023. Monetary default and project termination. Multiple notices of failure to provide audited financial statements. |

| Security Description | Fund Value as of 2/29/24 | Date and Nature of Default |
|---|---|---|
| Series A, 6.50%, 10/01/2032 (Obligor: Tuscan Gardens of Palm Coast Obligated Group) (CUSIP: 14052WCM7) | $566,800 | April 1 and October 1, 2022. Notice of non-payment to bondholders. January 13, 2023. Monetary defaults. |
| Series A, 6.75%, 10/01/2037 (Obligor: Tuscan Gardens of Palm Coast Obligated Group) (CUSIP: 14052WCN5) | $670,800 | |
| Series A, 7.00%, 10/01/2040 (Obligor: Tuscan Gardens of Palm Coast Obligated Group) (CUSIP: 14052WCP0) | $793,000 | |
| Series A, 7.00%, 10/01/2049 (Obligor: Tuscan Gardens of Palm Coast Obligated Group) (CUSIP: 14052WCT2) | $884,000 | |
| Series A, 6.50%, 06/01/2051 (Obligor: Last Step Recycling, LLC) | $1,214,423 | June 6, 2023. Unscheduled draw of debt service reserve fund. |
| Maine Finance Authority, 8.00%, 12/01/2051 (Obligor: Go Lab Madison, LLC) | $4,338,011 | January 11, 2024. Notice of default regarding construction contract and remedies. January 31, 2024. Equipment claim default. |
| Total Value of Undisclosed Defaulted Securities | $21,472,034 | |

131.    The 2024 Annual Report failed to comply with the SEC's rule on disclosure of defaulted securities in the Fund's financial statements. For the following securities in the Fund's portfolio, there was no disclosure of default in the 2024 Annual Report's financial statements:

| Security Description | Fund Value as of 8/31/24 | Date and Nature of Default |
|---|---|---|
| Series B, 6.38%, 02/15/2041 (Obligor: CC Young Memorial Home) | $302,500 | August 14, 2024. Notice that interest would not be paid and that events of default had occurred and have been continuing since 2022. |
| Series A, 5.50%, 07/15/2047 (Obligor: Rockwell Charter High School) | $1,285,709 | March 4, 2024. Borrower failed to maintain net income available for debt service equal to at least 100% of debt service for the fiscal year ended June 30, 2023. |
| Series A, 5.38%, 07/15/2042 (Obligor: Rockwell Charter High School) | $807,898 | |
| Series B, 6.63%, 07/15/2047 (Obligor: Rockwell Charter High School) | $271,162 | |
| 8.75%, 02/01/2036 (Obligor: Entsorga West Virginia) | $800,000 | October 6, 2022. Events of default had occurred and were continuing with respect to the bonds, under the bond documents, and under a forbearance agreement. |
| Lake Country, Series A1, 7.13%, 01/01/2052 (Obligor: Village Veranda at Lady Lake Obligated Group) | $4,350,000 | September 30, 2022. Events of default had occurred under the bond documents, including, but not limited to, the obligated group's continued failure to make the monthly payments. |
| Maine Finance Authority, 8.00%, 12/01/2051 (Obligor: Go Lab Madison, LLC) | $3,022,678 | April 5, 2024. Notice of default under loan agreement, and need to raise additional capital due to cost overruns and project delays. April-June 2024. Multiple mechanics liens that are events of default under loan agreement. |
| Total Value of Undisclosed Defaulted Securities | $10,839,947 | |

**K.    A Significant Portion of the Fund's Portfolio Was Invested in the Same or Related Businesses**

132.    Throughout the Class Period, the Fund's investment in the following municipal bonds (conduit financings) in the waste to marketable products business of the Jefferson Enterprise of companies exposed investors to undisclosed massive, correlated risks and losses:

| Security Description |
|---|
| Series 2020 Jefferson Enterprise Energy, LLC Project |
| Series 2019 Gladieux Metals Recycling Oklahoma, LLC Project |
| Series 2019A Gladieux Metals Recycling Oklahoma, LLC Project |
| Series 2019 Gladieux Metals Recycling, LLC Project |
| Series 2019A Gladieux Metals Recycling, LLC Project |
| Series 2019B Gladieux Metals Recycling, LLC Project |
| Series 2020 Texas Bluegrass Biofuels, LLC Project |
| Series 2019 TRP Crude Marketing, LLC Project |
| Series 2017 Allegiant Industrial, LLC Project |
| Series 2019 Allegiant Industrial Island Park Project |

133.    According to the Offering Memorandum for one of the bonds (Series 2020 Texas Bluegrass Biofuels, LLC Project), the Jefferson Enterprise of companies is a corporate conglomerate described as "an integrated development company focused on the planning, financing, and project management of mid-to-large scale facilities primarily dedicated to the preservation of natural resources by converting industrial waste into marketable products."

134.    The Jefferson Enterprise of companies include (i) Gladieux Metals Recycling, Freeport, Texas; (ii) Gladieux Metals Recycling, Atoka, Oklahoma; (iii) Allegiant Industrial, Beaumont, Texas; (iv) Allegiant Industrial, Kountze, Texas; (v) Texas Bluegrass Biofuels, Falmouth, Kentucky; and (vi) Jefferson Enterprise Energy, Texas. The Jefferson Enterprise of companies also includes Jefferson Enterprise, LLC, and TRP Crude Marketing Holdings, which managed TRP Crude Marketing, LLC, a development of a facility in Jefferson County, Texas for manufacturing products such as solvents from distressed oil reserves that would otherwise be discarded.

135.    The Jefferson Enterprise was led by Chief Executive Officer and owner Mr. Salazar, who has been described as the "founder and driving force behind the Jefferson Enterprise

group of environmental companies."[4] Through Jefferson Enterprise Management, LLC, Mr. Salazar, along with Chief Financial Officer, Robert Thayer, Randy Adair, Director of Facilities, and other Jefferson Enterprise employees, developed and managed the various projects of the Jefferson Enterprise affiliated companies. Many of these developments share the same address and registered agent at 9595 Six Pines Drive, Suite 6370, The Woodlands, Texas 77380.

136.    In addition to common management and oversight of the developments, the various developments of the Jefferson Enterprise affiliates were codependent and managed together, linking their financial prospects and increasing correlated risk. By way of example, the Jefferson Enterprises used its Allegiant Industrial's fabrication facilities to build and operate the developments at the Gladieux Metals Recycling projects at both Atoka, Oklahoma and Freeport, Texas, and the Bluegrass Biofuels soybean and used cooking oil facility in Kentucky. The revenues from the development of Gladieux Metals Recycling, Atoka, Oklahoma were dependent on purchases of its product from its sister facility, Gladieux Metals Recycling, Freeport, Texas, which is described in offering documents as the Atoka facility's "primary off-taker."

137.    There was a massive, undisclosed risk to Fund investors throughout the Class Period that if one development experienced financial distress, there was a very high contagion risk that could, and ultimately did, negatively affect all bonds in the same or related businesses.

138.    These municipal bonds were conduit financings that were issued by municipal authorities for the benefit of a single developer's group of environmental companies and consistently represented a significant percentage of the Fund's net assets throughout the Class Period:

---

[4] https://www.prnewswire.com/news-releases/empire-diversified-energy-inc-appoints-al-salazar-to-its-board-of-directors-301343669.html (last visited Nov. 28, 2025).

| Date | 8/31/22 | 8/31/23 | 11/30/23 | 8/31/24 | 2/28/25 | 5/31/25 |
|---|---|---|---|---|---|---|
| Fund NAV | $293.7mm | $274.0mm | $268.6mm | $336.4mm | $244.0mm | $180.3mm |
| Fund Valuation of Bonds | $41.4mm | $39.4mm | $39.3mm | $39.6mm | $36.3mm | $34.2mm |
| % of NAV Represented by Jefferson Enterprise Bonds | 14.10% | 14.38% | 14.63% | 11.77% | 14.88% | 18.97% |

139.    This level of exposure to a single developer in the industrial waste to marketable products business created correlated risk that exceeds what mutual fund investors might expect from a diversified municipal bond fund.

140.    The persistent double-digit exposure to these bonds in a specific sector as a percentage of the Fund's net assets throughout the Class Period exposed investors to correlated governance, management, and unique risks, such as the poor financial performance of the various Jefferson Enterprise-affiliated projects, and monetary defaults.

141.    Indeed, this set of bonds experienced poor financial performance and a cascade of parallel monetary defaults in 2024:

| CUSIP | Security Description | Initial Date of Monetary Default |
|---|---|---|
| 73360CAB0 | Series 2019 Allegiant Industrial Island Park Project | 8/2024 |
| 10604PAA1 | Series 2019 Gladieux Metals Recycling, LLC Project | 9/2024 |
| 10604PAB9 | Series 2019A Gladieux Metals Recycling, LLC Project | 9/2024 |
| 10604PAC7 | Series 2019B Gladieux Metals Recycling, LLC Project | 9/2024 |
| 47353PAA6 | Series 2019 TRP Crude Marketing, LLC Project | 10/2024 |
| 049610AA6 | Series 2019 Gladieux Metals Recycling Oklahoma, LLC Project | 11/2024 |
| 049610AB4 | Series 2019A Gladieux Metals Recycling Oklahoma, LLC Project | 11/2024 |

| CUSIP | Security Description | Initial Date of Monetary Default |
|---|---|---|
| 500726AA2 | Series 2017 Allegiant Industrial, LLC Project | 11/2024 |
| 306767AA2 | Series 2020 Texas Bluegrass Biofuels, LLC Project) Series 2020 (KY) | 12/2024 |
| 03469KAA1 | Series 2020 Jefferson Enterprise Energy, LLC Project | 12/2024 |

142.    The correlated risks were unique to the Fund and posed an undisclosed risk to Fund investors that could, and ultimately did, have a massive negative impact on the Fund's assets and on Fund investors as the value of these bonds experienced correlated defaults and declines in value.

## VI.    The Fund's Registration Statements and Prospectuses Contained Materially False and Misleading Statements

143.    The registration statements and prospectuses delineated below contained untrue statements of material fact, omitted to state material facts required to be stated in a registration statement, or omitted to state facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.

### A.    The Registration Statements and Prospectuses Misrepresented the Fund's Compliance with the SEC's and the Fund's Limitation on Illiquid Investments

144.    The 2/16/2022 Registration Statement, 12/28/2022 Registration Statement, 12/28/2023 Registration Statement, 8/29/2024 Registration Statement, 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus and 10/4/2024 Registration Statement represented in substantially the same form that the Fund:

> may not acquire any illiquid investments if, immediately after the acquisition, [the] Fund would have invested more than 15% of its net assets in illiquid investments that are assets.

145.    The 2/16/2022 Registration Statement, 12/28/2022 Registration Statement, 12/28/2023 Registration Statement and 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus represented in substantially the same form that:

Except with respect to . . . investments in illiquid investments, if a percentage or rating restriction on investment or use of assets set forth herein or in the Prospectus is adhered to at the time a transaction is effected, later changes in percentage resulting from any cause other than actions by a Fund will not be considered a violation . . . If at any time [the] Fund's illiquid investment are greater than 15% of its net assets, [the] Fund will determine how to remediate the excess illiquid investments in accordance with the 1940 Act and [the] Fund's policies and procedures.

146.    The 12/28/2022 Registration Statement incorporated by reference the Fund's SAI dated December 29, 2022 (the "12/29/2022 SAI"). The 12/29/2022 SAI incorporated by reference the Fund's 2022 Annual Report, dated August 31, 2022, and filed with the SEC on November 7, 2022 on Form N-CSR ("2022 Annual Report"), that represented that the Fund "will not hold more than 15% of the value of [its] net assets in illiquid securities."

147.    The 12/30/2024 Registration Statement represented that the Fund "will not invest more than 15% of the value of its net assets in securities that are illiquid, including . . . securities that are illiquid by virtue of the absence of a readily available market" and "[i]f through the appreciation of illiquid securities or the depreciation of liquid securities, a Fund should be in a position where more than 15% of the value of its net assets are invested in illiquid assets, including restricted securities, the Fund will take appropriate steps to protect liquidity."

148.    These representations were materially false and misleading because, as alleged in paragraphs 82-88, throughout the Class Period the Fund's holdings of illiquid assets exceeded 15% of the Fund's net assets at all relevant times.

149.    The 2/16/2022 Registration Statement, 12/28/2022 Registration Statement, 12/28/2023 Registration Statement, 8/29/2024 Registration Statement, 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus, 10/4/2024 Registration Statement and 12/30/2024 Registration Statement represented the following concerning liquidity risk:

*Liquidity Risk*. Liquidity risk occurs when certain investments become difficult to purchase or sell. Difficulty in selling less liquid securities may result in sales at

46

disadvantageous prices affecting the value of your investment in the Fund. Liquid securities can become illiquid during periods of market stress. **If a significant amount of the Fund's securities become illiquid, the Fund may not be able to timely pay redemption proceeds and may need to sell securities at significantly reduced prices**.

(Emphasis added).

150.    These representations were materially false and misleading because they presented the risk that the Fund may have a significant amount of illiquid securities as a hypothetical, future risk, when in fact, as alleged in paragraphs 82-88, throughout the Class Period, a significant amount of the Fund's securities were illiquid and exceeded 15% of the Fund's net assets.

**B.    The Registration Statements and Prospectuses' Misstatements Concerning Valuation**

151.    The 2/16/2022 Registration Statement, 12/28/2022 Registration Statement, 12/28/2023 Registration Statement and 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus represented that the Fund's "assets are generally valued at their market price on the valuation date and are based on valuations provided by independent pricing services consistent with the Trust's valuation procedures."

152.    The 8/29/2024 Registration Statement, 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus, 10/4/2024 Registration Statement and 12/30/2024 Registration Statement represented that:

The Trust's Board of Trustees has approved the use of nationally recognized bond pricing services for the valuation of each Fund's debt securities. The services selected create and maintain price matrices of U.S. government and other securities from which individual holdings are valued shortly after the close of business each trading day. Debt securities not covered by the pricing services are valued upon bid prices obtained from dealers who maintain an active market therein or, if no readily available market quotations are available from dealers, such securities (including restricted securities and OTC options) are valued at fair value under the Board's procedures. Short-term (having a maturity of 60 days or less) debt securities may be valued at amortized cost.

153.    These representations were materially false and misleading because they failed to disclose that, as alleged in paragraphs 89-116, the Fund's valuation procedures were materially deficient and its pricing service had been providing materially overstated valuations for the Fund's assets and thereby materially overstated the Fund's NAV, and as alleged in paragraphs 117-26, the board of trustee's fair value procedures were materially defective and the Fund materially overvalued at least one of the Fund's Level 3 assets.

154.    The 12/28/2023 Registration Statement, 8/29/2024 Registration Statement, 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus, 10/4/2024 Registration Statement and 12/30/2024 Registration Statement represented in substantially the same form the following concerning valuation of its assets:

> *Valuation Risk.* The price the Fund could receive upon the sale of any particular portfolio investment may differ from the Fund's valuation of the investment, particularly for securities that trade in thin or volatile markets or that are valued using a fair valuation methodology or a price provided by an independent pricing service. As a result, the Fund could realize a greater than expected loss or lesser than expected gain upon the sale of the investment. Unlike equity securities, which are valued using market quotations, the municipal bonds in which the Fund primarily invests are fixed income securities which are typically valued by independent pricing services utilizing a range of market-based and security specific inputs and assumptions, including price quotations from broker-dealers making markets in such instruments, transactions in comparable investments and considerations about general market conditions. The Fund's ability to value its investments may also be impacted by technological issues and/or errors by pricing services or other third-party service providers.

155.    These representations were materially false and misleading because the Fund's ability to value its investments had already been impacted by errors by its pricing service and had been materially overstating the value of certain of its securities. As alleged in paragraphs 89-116, the Fund's pricing service was materially deficient and had been providing materially overstated valuations for the Fund's assets, and the Fund had materially overstated the value of its assets and the Fund's NAV.

48

156.    The 2/16/2022 Registration Statement and 12/28/2022 Registration Statement failed to disclose valuation risk among the principal risks of investing in the Fund, which it was required to do under SEC rules and regulations, including those delineated in paragraphs 59-64.

### C.    The Registration Statements and Prospectuses Misrepresented the Fund's Investment Strategy Regarding Defaulted Securities

157.    The 12/28/2022 Registration Statement, 12/28/2023 Registration Statement, 8/29/2024 Registration Statement, 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus, 10/4/2024 Registration Statement, 12/30/2024 Registration Statement represented in substantially the same form the following regarding the Fund's investment strategy regarding defaulted securities:

> [the Fund] may purchase defaulted securities if the Adviser believes that there is potential for resumption of income payments or realization of income on the sale of the securities or the collateral or other advantageous developments appear likely in the near future. Notwithstanding the Adviser's belief about the resumption of income payments or realization of income, the purchase of defaulted securities is highly speculative and involves a high degree of risk, including the risk of a substantial or complete loss of the Fund['s] investment. Defaulted securities are subject to the Fund['s] limitation on holding below-investment-grade securities. **The Adviser does not expect that this will be a significant investment strategy of the Funds.**

(Emphasis added).

158.    These representations were materially false and misleading because as delineated in paragraphs 127-28, throughout the Class Period, a significant investment strategy of the Fund was to invest in defaulted securities and that a substantial amount of securities that the Fund had already purchased were defaulted. The amount of the Fund's assets committed to defaulted securities, the amount of the Fund's assets placed at risk by its investment in defaulted securities, and the likelihood of the Fund losing some or all of those assets from investing in defaulted securities demonstrate that the Fund's investment in defaulted securities was a principal and significant investment strategy. Indeed, a substantial amount in terms of dollars, percentage of

investments in the Fund, and as a percentage of net assets of the Fund, had been invested in defaulted securities throughout the Class Period and ultimately were sold at significant discounts to the Fund's valuation.

159.    The 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus incorporated by reference the Fund's financial statements in the 2024 Semi-Annual Report, and the 10/4/2024 Registration Statement incorporated by reference the Fund's financial statements in the 2024 Semi-Annual Report.

160.    The 12/30/2024 Registration Statement incorporated by reference the Fund's financial statements contained in 2024 Annual Report.

161.    These representations were materially false and misleading because the Fund's financial statements as of February 29, 2024 set forth in the 2024 Semi-Annual Report, and the Fund's financial statements as of August 31, 2024 set forth in the 2024 Annual Report failed to disclose a material amount of defaulted securities as alleged in paragraphs 129-31.

**D.    The Registration Statements and Prospectuses Misrepresented the Fund's Significant Investment in the Same or Related Businesses**

162.    The 2/16/2022 Registration Statement, 12/28/2022 Registration Statement, 12/28/2023 Registration Statement, 8/29/2024 Registration Statement, 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus, 10/4/2024 Registration Statement, and 12/30/2024 Registration Statement represented in substantially the same form the following concerning the Fund's investment in the same or related businesses:

> *Sector Emphasis Risk.* The securities of issuers **in the same or related businesses** ("industry sectors"), **if comprising a significant portion of the Fund's portfolio**, **may** in some circumstances react negatively to market conditions, interest rates and economic, regulatory or financial developments and adversely affect the value of the portfolio to a greater extent than if such securities comprised a lesser portion of the Fund's portfolio or the Fund's portfolio was diversified across a greater number of industry sectors. Some industry sectors have particular risks that may not affect other sectors.

(Emphasis added).

163.    These representations were materially false and misleading because the risk of the Fund's investments in securities in the same or related businesses was represented as a hypothetical, future risk and that the Fund's diverse holdings were not subject to this risk, when, in fact, as alleged in paragraphs 132-42, throughout the Class Period the Fund already had a material, undisclosed investment in securities that comprised a significant portion of the Fund's portfolio and were in the waste to marketable products business of the Jefferson Enterprise of environmental companies.

## VII.    Class Action Allegations

164.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of all persons or entities who during the Class Period purchased or otherwise acquired Class A, Investor Class or Institutional Class shares of the Fund (tickers: RMJAX, RMHVX, RMHIX, GSTFX, GSTEX, GSTAX), pursuant to or traceable to the Fund's registration statements and prospectuses and sustained damages; or (ii) held shares of the Fund as of September 30, 2024 and were entitled to vote on the reorganization of the Fund from a series of the MPS Trust into a series of the Easterly Trust (the "Class"). Excluded from the Class are Defendants, the officers, and directors or trustees of any of the Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

165.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery from Defendants, Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed Class.

166.    Class members may be identified from records maintained by or on behalf of the Fund or its transfer agent and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions. Ultimus Fund Solutions, LLC, located at 225 Pictoria Drive, Suite 450, Cincinnati, Ohio 45246, serves as the Easterly Trust's transfer agent and shareholder servicing agent.

167.    Plaintiff's claims are typical of all other Class members' claims, as all Class members are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

168.    Plaintiff has and will continue to fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class and securities litigation.

169.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual class members. Among the questions of law and fact common to the Class are: (i) whether Defendants' acts and omissions, as alleged herein, violated the Securities Act and the Exchange Act; (ii) whether Defendants' statements delineated above in the registration statements and prospectuses distributed to the investing public during the Class Period misrepresented or omitted material facts about the Fund's operations, business, and management of the Fund and were negligently prepared; (iii) to what extent the Class members have sustained damages; and (iv) the proper measure of such damages.

170.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to redress

individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII.   Causes of Action

### Count I

**Violations of Section 11 of the Securities Act**
**(Against Defendants the MPS Trust, the Easterly Trust, Eirich, Wiedmeyer,**
**Kern, Massart, Swanson, Rush, Crate, Montague, Medugno, Spencer,**
**Quasar Distributors and Easterly Securities)**

171.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

172.    This Count is brought under Section 11 of the Securities Act, 15 U.S.C. § 77k, against Defendants Eirich, Wiedmeyer, Kern, Massart, Swanson, Rush, Crate, Montague, Medugno, and Spencer who served as trustees and/or officers during the Class Period of the MPS Trust or Easterly Trust and signed one or more of the registration statements delineated above. This Count is also brought against the MPS Trust and the Easterly Trust, which issued shares of the Fund and are strictly liable, and against Quasar Distributors and Easterly Securities, which underwrote and distributed shares of the Fund to investors.

173.    This Count is not based on and does not sound in fraud.

174.    The registration statements and prospectuses for the Fund and the documents incorporated therein, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and/or omitted to state material facts required to be stated therein.

175.    Plaintiff and the Class acquired the Fund's shares pursuant to materially false and misleading registration statements and prospectuses.

176.    Plaintiff and the Class have sustained damages in that the value of the Fund's shares has declined substantially from the prices at which they were purchased.

177.    At the time of their purchases of the Fund's shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the untrue statements or omissions herein and could not have reasonably discovered those facts prior to the date of the filing of this action.

178.    Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based. Less than three years have elapsed from the time that Plaintiff purchased the Fund shares upon which this Count is brought to the time this action was filed.

## Count II

**Violations of Section 12(a)(2) of the Securities Act**
**(Against Defendants the MPS Trust, the Easterly Trust, Quasar Distributors**
**and Easterly Securities)**

179.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

180.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C.§ 77l(a)(2), on behalf of Plaintiff and other members of the Class who were offered or sold shares of the Fund against the MPS Trust, the Easterly Trust, Quasar Distributors and Easterly Securities. The Section 12(a)(2) Defendants were sellers and offerors and/or solicitors of purchasers of shares of the Fund offered under the registration statement and prospectuses for the Fund.

181.    This Count is not based on and does not sound in fraud.

182.    Defendants the MPS Trust, the Easterly Trust, Quasar Distributors and Easterly Securities offered and sold a security, namely shares of the Fund, by means of the registration statements, prospectuses and summary prospectuses. The prospectuses and summary prospectuses

contained untrue and/or misleading statements of material fact, contained material omissions, or omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

183.    Defendants MPS Trust, the Easterly Trust, Quasar Distributors and Easterly Securities actively solicited the sale of the Fund's shares through the prospectuses and summary prospectuses, advertising, and other marketing efforts on the Fund's website and through wholesalers to serve their own financial interests and are liable to Plaintiff and Class members under Section 12(a)(2) of the Securities Act, as sellers of the shares of the Fund.

184.    At the time they purchased the Fund's shares from Defendants MPS Trust, the Easterly Trust, Quasar Distributors and Easterly Securities, Plaintiff and other members of the Class did not know that the representations made to them by Defendants MPS Trust, the Easterly Trust, Quasar Distributors and Easterly Securities in connection with the offer and sale of shares and the matters described above were untrue, did not know the above described omitted material facts were not disclosed, and could not have reasonably discovered those facts.

185.    Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that this action was filed. Less than three years have elapsed from the time that Plaintiff purchased the Fund shares upon which this Count is brought to the time this action was filed.

186.    Under Section 12(a)(2) of the Securities Act, Plaintiff and Class members are entitled to recover, upon tender of the Fund shares they purchased, the consideration paid for the shares with interest thereon, less the amount of any income received thereon, or damages resulting from Defendants the MPS Trust, the Easterly Trust, Quasar Distributors and Easterly Securities' wrongful conduct.

187.    Putative Class members who still hold shares of the Fund and were damaged by Defendants' violation of Section 12(a)(2) of the Securities Act hereby tender those shares in the Fund.

## Count III

### Violations of Section 15 of the Securities Act
### (Against Defendants Eirich, Wiedmeyer, Kern, Massart, Swanson, Rush, Crate, Montague, Medugno, Spencer, the Portfolio Manager Defendants, Principal Street Partners and Easterly Investment Partners)

188.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

189.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 78o, against Defendants Eirich, Wiedmeyer, Kern, Massart, Swanson, Rush, Crate, Montague, Medugno, Spencer, the Portfolio Manager Defendants, Principal Street Partners and Easterly Investment Partners as control persons of the MPS Trust or the Easterly Trust who violated Sections 11 and Section 12, as alleged in Counts I and II.

190.    Defendants Eirich, Wiedmeyer, Kern, Massart, Swanson, Rush, Crate, Montague, Medugno, Spencer were each a control person by virtue of their position as a trustee and/or senior officer of the MPS Trust or the Easterly Trust. They were in a position to, and did, control the Fund's operations and disclosures made in the registration statements and prospectuses issued during the Class Period and possessed authority to determine which securities and the amounts of securities that were bought or sold by the Fund and their valuations, and the Fund's disclosures to investors.

191.    The Portfolio Manager Defendants were each a control person by virtue of their positions as the portfolio manager of the Fund who were responsible for, among other things, choosing the Fund's investments and handling its day-to-day business.

192.    Defendants Principal Street Partners and Easterly Investment Partners, as investment advisors to the Fund, were assigned responsibility for managing the Fund in accordance with its investment objectives and policies by the MPS Trust and the Easterly Trust and SEC rules and regulations.

193.    Defendants Eirich, Wiedmeyer, Kern, Massart, Swanson, Rush, Crate, Montague, Medugno, Spencer, the Portfolio Manager Defendants, Principal Street Partners and Easterly Investment Partners are liable, as control persons, for damages caused by the violations of Section 11 and Section 12.

194.    This claim was brought within one year after the discovery of the untrue statements and omissions in the registration statements and prospectuses and within three years after the Fund's shares were sold to the Class.

195.    Because of the misconduct alleged herein, Defendants Eirich, Wiedmeyer, Kern, Massart, Swanson, Rush, Crate, Montague, Medugno, Spencer, the Portfolio Manager Defendants, Principal Street Partners and Easterly Investment Partners are jointly and severally liable with and to the same extent as defendants named under Counts I and II.

## Count IV

**Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
**(Against Defendants the Easterly Trust, Crate, Montague, Medugno and Spencer)**

196.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

197.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, prohibit the solicitation of proxies by means of a proxy statement that contains any statement which, at the time and in light of the circumstances under which it is made, is false

or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading.

198.   This Count is not based on and does not sound in fraud.

199.   Defendants Crate, Montague, Medugno, Spencer and the Easterly Trust solicited proxies from Plaintiff and other shareholders through the 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus filed with the SEC in connection with the Reorganization. Defendants Crate, Montague, Medugno, Spencer signed the 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus.

200.   The 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus contained materially false and misleading statements and omissions, as delineated above.

201.   These misstatements and omissions were material because a reasonable shareholder would consider them important in deciding how to vote on the Reorganization.

202.   Defendants Crate, Montague, Medugno, Spencer and the Easterly Trust acted at least negligently in causing the 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus to contain these misstatements and omissions.

203.   The proxy solicitation was an essential link in the accomplishment of the transaction because shareholder approval was required for the transaction to proceed.

204.   As a direct and proximate result of Defendants Crate, Montague, Medugno, Spencer and the Easterly Trust's violations of Section 14(a) and Rule 14a-9, Plaintiff and the Class have suffered damages, including loss of the fair value of their shares and being deprived of an informed vote.

## Count V

### Violation of Section 20(a) of the Exchange Act
### (Against Defendants Crate, Montague, Medugno, Spencer
### and the Portfolio Manager Defendants)

205.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

206.     Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), provides that any person who, directly or indirectly, controls any person liable under any provision of the Exchange Act or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as the controlled person.

207.     Defendants Crate, Montague, Medugno, Spencer and the Portfolio Manager Defendants by virtue of their positions as officers and/or trustees of the Easterly Trust or portfolio managers of the Fund, had the power and authority to control and did control, directly or indirectly, the content and dissemination of the 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus and other statements issued by the Easterly Trust in connection with the solicitation of shareholder approval for the Reorganization and negligently prepared the 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus. Defendants Crate, Montague, Medugno and Spencer signed the 9/5/2024 Registration Statement and Joint Proxy Statement/Prospectus. The Portfolio Manager Defendants served as proxies on behalf of shareholders in connection with the Joint Special Meeting of Shareholders held on September 30, 2024.

208.     As a result of the foregoing, Defendants Crate, Montague, Medugno, Spencer and the Portfolio Manager Defendants are liable under Section 20(a) of the Exchange Act for the primary violations of Section 14(a) and Rule 14a-9.

## IX.    Prayer for Relief

**WHEREFORE**, Plaintiff, on behalf of himself and the other members of the Class, prays for judgment as follows:

A.  Declaring this action to be a class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Class with Plaintiff as Class Representative and certifying Plaintiff's counsel as Class Counsel;

B.  Awarding Plaintiff and the other members of the Class damages against Defendants, jointly and severally, together with interest thereon;

C.  Awarding Plaintiff and the other members of the Class rescission on Count II, to the extent they still hold shares of the Fund that were damaged by Defendants' violations of Section 12(a)(2) of the Securities Act;

D.  Awarding Plaintiff and the other members of the Class their costs and expenses of this action, including reasonable attorneys' fees, experts' fees and other costs and disbursements; and

E.  Awarding Plaintiff and the other members of the Class such other and further relief as the Court deems appropriate under the circumstances.

## X.    Jury Trial Demanded

Plaintiff hereby demands a trial by jury.

Dated: December 5, 2025                          Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

_/s/   Jeffrey P. Campisi_
Frederic S. Fox
Donald R. Hall
Jeffrey P. Campisi
Brandon Fox
Clara Abramson
800 Third Avenue, 38th Floor

New York, NY 10022
T: (212) 687-1980
F: (212) 687-7714
jcampisi@kaplanfox.com
ffox@kaplanfox.com
dhall@kaplanfox.com
bfox@kaplanfox.com
cabramson@kaplanfox.com

*Lead Counsel for Lead Plaintiff Richard
Fulford and the Proposed Class*