UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- X

IN RE EASTERLY ROCMUNI HIGH INCOME MUNICIPAL BOND FUND

---------------------------------------- X

25cv6028 (DLC)

OPINION & ORDER

APPEARANCES:

For plaintiffs:

Frederic S. Fox
Jeffrey P. Campisi
Donald R. Hall
Brandon Fox
Clara Abramson
Kaplan Fox & Kilsheimer LLP
800 Third Avenue, 38th Floor
New York, NY 10022

For defendants:

Robert J. Giuffra, Jr.
David M.J. Rein
Morgan R. Knudtsen
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004

Alexander Breckinridge
Mark A. Cunningham
Robert B. Bieck, Jr.
Jones Walker LLP
201 St. Charles Avenue
New Orleans, Louisiana 70170

Joseph E. Bain
Jones Walker LLP
261 Madison Avenue, 9th Floor
New York, New York 10016

Joshua A. Dunn
Thomas P. Cimino Jr.
Steven J. Dollear
Nusra Ismail
Vedder Price P.C.

1633 Broadway, 31st Floor
New York, New York 10019

John G. Moon
Adrienne M. Ward
Sahand Farahati
Olshan Frome Wolosky LLP
1325 Avenue of the Americas
New York, New York 10019

James K. Goldfarb
Cameron S. Matheson
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 42nd Floor
New York, New York 10020

DENISE COTE, District Judge:

This putative class action arises from the collapse of the Easterly ROCMuni High Income Municipal Bond Fund (the "Fund"), an open-end mutual fund invested in tax-exempt debt securities, the majority of which were colloquially termed junk bonds. Lead Plaintiff Richard Fulford alleges that the Fund and the other defendants violated strict liability and control person provisions in the Securities Act of 1933 ("Securities Act") and the Exchange Act of 1934 ("Exchange Act") by misrepresenting or omitting material facts in registration statements and other SEC filings. The statements at issue concern the Fund's liquidity, valuation practices, investments in defaulted securities, and concentration in related businesses.

Defendants have moved to dismiss the Second Amended Complaint ("SAC"). Plaintiff has also moved to strike and in

opposition to judicial notice of certain exhibits submitted with defendants' motion, including the SEC filings that contain the statements at issue. For the following reasons, the motion to strike is largely denied. The motion to dismiss the Exchange Act claims and to dismiss all claims against defendants Principal Street Partners, LLC, Easterly Investment Partners LLC, Troy Willis, and Charlie Pulire is granted. The motion to dismiss is otherwise largely denied.

## Background

The following facts are derived from the SAC and other materials properly considered on a motion to dismiss. For the purposes of this motion, the SAC's factual allegations are taken as true, and all reasonable inferences are drawn in plaintiff's favor.

The Fund, formerly known as the Principal Street High Income Municipal Fund, was registered as an open-end mutual fund. The Fund's primary objective was to generate tax-exempt income by investing at least eighty percent (80%) of its net assets in municipal securities. The Fund's portfolio included high-yield, below-investment-grade, unrated debt or junk bonds.

Before October 2024, the Fund was a series of the Managed Portfolio Series Trust (the "MPS Trust"), and Principal Street Partners, LLC was its investment adviser. In October 2024,

after a shareholder vote, the Fund was reorganized into a series of the James Alpha Funds Trust, doing business as the Easterly Funds Trust (the "Easterly Trust"). Easterly Investment Partners LLC replaced Principal Street Partners, LLC as investment adviser. Defendants Troy Willis and Charlie Pulire remained the Fund's portfolio managers.

An open-end mutual fund calculates a net asset value ("NAV") for its shares each business day and must be able to satisfy shareholder redemption requests. To guarantee that a fund has sufficient liquidity to do so, SEC Rule 22e-4 prohibits a fund from acquiring an illiquid investment if, "immediately after the acquisition," more than 15% of its net assets would consist of illiquid investments. 17 C.F.R. § 270.22e-4(b)(1)(iv). The Rule defines an "illiquid investment" as an investment that a fund "reasonably expects cannot be sold or disposed of in current market conditions in seven calendar days or less without the sale or disposition significantly changing the market value of the investment." Id. § 270.22e-4(a)(8). If a fund holds more than 15% of its net assets in illiquid investments then the fund is required to take steps that include developing a program "to bring its illiquid investments that are assets to or below 15% of its net assets within a reasonable period of time." Id. § 270.22e-4(b)(1)(iv)(A).

Between July 29, 2022 and June 12, 2025 (the "Class Period"), the MPS Trust and Easterly Trust offered Fund shares on a continuous basis through a series of registration statements and prospectuses. The September 5, 2024 registration statement also served as the joint proxy statement and prospectus for the shareholder vote on the Fund's reorganization as the Easterly Funds Trust (the "Proxy"). Plaintiff alleges that these documents were materially false or misleading in four respects.

First, the Fund stated in various SEC filings that it "will not hold" more than 15% of the value of its net assets in illiquid investments, adopting the SEC's definition of "illiquid investment."[1] The SAC identifies, however, eleven municipal bonds, representing between 15.01% and 22.8% of the Fund's NAV at several reporting dates, that had "economic attributes of illiquidity". It asserts that they were unrated, thinly traded, issued in large denominations, held by a small group of investors, and supported by information available only through confidential data rooms. The SAC alleges that these bonds, combined with the Fund's other highly illiquid assets, accounted

[1] The statements on which the SAC focuses can be found in one or more of the Fund's SEC filings. The parties do not contend that the statements' absence from other SEC filings will affect the outcome of this motion.

for at least 45% of the Fund's net assets two weeks before its collapse.

Second, the Fund represented that its assets were "generally valued at their market price using valuations provided by independent pricing services." Other assets were "valued at fair value under the Board's procedures." The SAC alleges, however, that these representations were misleading because they failed to disclose that the Fund's valuation procedures were materially deficient and overstated the value of the Fund's assets.

Specifically, the pricing services disregarded trades involving less than $1 million in face value ("odd-lot transactions") even when those trades concerned the same securities and occurred at prices far below the Fund's marks. The SAC identifies, among other transactions, early-2025 trades in several defaulted bonds at prices ranging from approximately 7.5 to 40 cents on the dollar while the Fund's pricing services allegedly valued the same securities at approximately 33 to 90 cents on the dollar.

The SAC also alleges that the Board's "fair value procedures" for valuing its Level 3 Assets were defective.[2] As

[2] The Fund adopted the Financial Account Standards Board's fair value hierarchy for measuring fair value under three levels. Under these standards, Level 1 assets are valued using "quoted

an example, the SAC highlights the Fund's investment in Next Renewable Fuels, Inc., which represented over 3% of the Fund's assets as of May 31, 2025. On that date, and throughout the Class Period, the Fund valued the asset at over $5 million, even though a proposed merger on which that valuation depended was terminated, allegedly rendering the asset worthless as of November 1, 2023.

Third, the Fund disclosed that it could purchase defaulted securities when the adviser believed favorable developments were likely but stated that the adviser did not expect this to be "a significant investment strategy of the Funds." The SAC alleges that defaulted securities ultimately constituted as much as 35% of the Fund's assets and more than $60 million in reported value. It further alleges that financial statements incorporated into certain registration statements failed to identify all the securities that were in monetary default, amounting to over $21 million in undisclosed defaulted securities.

---

prices in active markets for identical assets." Level 2 assets are valued using observable inputs other than quoted prices for identical assets, including quoted prices for similar assets or other observable market data. Level 3 assets are valued using significant unobservable inputs and therefore require greater reliance on judgment in estimating fair value.

Fourth, the Fund warned investors that if a "significant portion of the Fund's portfolio" was invested in "the same or related businesses," then the Fund could be adversely affected to a greater extent than if it were more diversified. The SAC alleges, however, that while issuing this hypothetical warning, the Fund had already invested 11.77% to 18.97% of its net assets in ten projects tied to a single developer and corporate conglomerate. These projects allegedly shared management, facilities, business relationships, and financial dependencies, leading several to default between August and December 2024. According to the SAC, the Fund failed to disclose these interconnected corporate relationships and the high risks of this concentrated investment in its registration statements and prospectuses.

On June 12, 2025, at the end of the Class Period, the Fund reported an NAV of $6.15 per share. The next day, its NAV fell to $4.33 per share, a decline of more than 30%.[3] Meanwhile, the Bloomberg High Yield Municipal Bond Index -- indicative of general market conditions -- was essentially flat. The Fund then sold numerous securities at steep discounts to the values

[3] The June 13 redemption price was later revised to $3.99 per share.

it had reported on May 31. By July 22, the Fund's reported NAV had declined by more than 52% since June 12.

On December 29, the Easterly Trust approved a plan to liquidate and dissolve the Fund. As of December 30, the Fund's last reported NAV was $2.18 per share, and its net assets were approximately $8.8 million, a decline of more than 95% since the end of the Class Period.

Fulford purchased Fund shares during the Class Period. He filed this action on July 24, 2025, alleging violations of §§ 11, 12(a)(2), and 15 of the Securities Act. He brings the action individually and on behalf of investors who purchased shares of the Fund, pursuant to or traceable to the Fund's registration statements and prospectuses, as well as those who held shares of the Fund as of September 20, 2024, and were entitled to vote on the reorganization of the Fund from a series of the MPS Trust into a series of the Easterly Trust (the "Proposed Class").

Another putative class action was filed two days earlier, also on behalf of investors in the Fund. An Order of October 9, 2025 consolidated the two actions (No. 25-cv-6028 and No. 25-cv-6102), appointed Richard Fulford as Lead Plaintiff, and appointed Kaplan Fox & Kilsheimer LLP to serve as Lead Counsel.

Fulford filed the First Amended Complaint on December 8, 2025. After defendants moved to dismiss, he filed the SAC on February 20, 2026. The SAC asserts strict liability and negligence claims under §§ 11, 12(a)(2), and 15 of the Securities Act and §§ 14(a) and 20(a) of the Exchange Act against the Fund, its registrants, current and former investment advisers, portfolio managers, officers and trustees, and current and former underwriters.

Defendants filed their joint motion to dismiss the SAC on March 23. The motion was accompanied by the declaration of David M.J. Rein of Sullivan & Cromwell LLP (the "Rein Declaration") and forty-one exhibits. On April 23, plaintiff opposed the motion to dismiss and moved to strike and in opposition to judicial notice of many of the Exhibits to the Rein Declaration or, alternatively, to convert the motion to dismiss into a motion for summary judgment, which it argued should be promptly denied. The motion to dismiss was fully submitted on May 7, and the motion to strike was fully submitted on May 14.

## Discussion

### I. Motion to Strike

When deciding a motion brought under Rule 12(b)(6), Fed. R. Civ. P., a court may consider the complaint and "documents that

are attached to. . . [or] incorporated in it by reference, integral to [it], or the proper subject of judicial notice." United States v. Strock, 982 F.3d 51, 63 (2d Cir. 2020) (citation omitted). A document is "considered 'integral' to the complaint in a narrow set of circumstances, where the plaintiff relies heavily on the document's terms and effect in pleading his claims and there is no serious dispute at to the document's authenticity." United States ex rel. Foreman v. AECOM, 19 F.4th 85, 107 (2d Cir. 2021). Where a district court considers material outside these categories to decide an issue on the merits, the court "must convert the motion into one for summary judgment." Id. at 106.

Federal Rule of Evidence 201 permits judicial notice of an adjudicative fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." CITGO Petroleum Corp. v. Ascot Underwriting Ltd., 158 F.4th 368, 389 (2d Cir. 2025) (quoting Fed. R. Evid. 201(b)). Public records, including SEC filings, may be noticed to establish their existence and contents. Bellin v. Zucker, 6 F.4th 463, 471 n.10 (2d Cir. 2021); Gimpel v. The Hain Celestial Grp., Inc., 156 F.4th 121, 129 (2d Cir. 2025). And courts may take judicial notice "of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information,

without regard to the truth of their contents." Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).

Plaintiff moves to strike and in opposition to defendants' request for judicial notice of Exhibits 1-3, 21-24, and 31-41 attached to the Rein Declaration submitted in support of defendants' motion to dismiss. In the alternative, plaintiff moves pursuant to Rule 56, Fed. R. Civ. P., to convert the motion to dismiss into a motion for summary judgment. Plaintiff does not oppose defendants' request for judicial notice of the remaining exhibits (Exhibits 4-20 and 25-30), all of which are documents cited, quoted, or relied upon in SAC.

A. Public Filings and Municipal-Securities Records (Exhibits 21-24, 36-40)

Exhibits 21-24 are SEC filings. Exhibits 36-38 are reports published by the Municipal Securities Rulemaking Board ("MSRB") and Exhibits 39 and 40 are municipal-securities documents available through the MSRB's Electronic Municipal Market Access system ("EMMA"). Judicial notice is taken of the fact that these public records existed, were publicly available, and contained the statements reproduced in them, but not the truth of the matters asserted within.

B. News Reports (Exhibit 3, 31-35)

Exhibit 3 is a Morningstar editorial dated December 26, 2023, on which defendants rely to argue that the Fund's investors have been on notice of their Securities Act claims since 2023. Exhibits 31-35 are other news reports and publicly available articles. Judicial notice is taken of the fact that the Morningstar editorial and other articles were published, when they were published, and what information they conveyed to the public, but the Court does not accept their contents as true. Staehr, 547 F.3d at 425-26.

C. Historical Net Asset Values (Exhibit 41)

Exhibit 41 presents the reported historical NAVs of the Fund's share classes, as reported by Yahoo! Finance, before and after the Morningstar editorial was published. Historical securities prices are proper subjects of judicial notice. Ganino v. Citizens Utils. Co., 228 F.3d 154, 166 n.8 (2d Cir. 2000). The Court therefore notices the reported values, but not any proposed explanation for the changes in those values.

D. Counsel-Prepared Charts (Exhibits 1-2)

Exhibits 1 and 2 are charts prepared by defendants' counsel "for the convenience of the Court." Exhibit 1 identifies all statements alleged in the SAC to be false or misleading and defendants' asserted grounds for dismissal. Exhibit 2 lists the

Fund's risk disclosures made to investors in SEC filings, and the paragraph number of the SAC or judicially-noticed document in which the cautionary disclosure is referenced. The charts may be used as aids in locating material in the underlying documents.

The motion to strike is therefore granted to the extent defendants seek to use the challenged exhibits for the truth of disputed assertions. It is otherwise denied. Plaintiff's alternative request for conversion is denied.

II. Motion to Dismiss

To survive a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Doe v. Franklin Square Union Free School Dist., 100 F.4th 86, 94 (2d Cir. 2024) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Vengalattore v. Cornell Univ., 36 F.4th 87, 102 (2d Cir. 2022) (quoting Iqbal, 556 U.S. at 678). In determining if a claim is sufficiently plausible to withstand dismissal, a court "must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the

non-moving party." Doe, 100 F.4th at 94 (citation omitted). Where, like here, the claims do not sound in fraud, the complaint need not satisfy the heightened particularity requirements of Rule 9(b), Fed. R. Civ. P. In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010).

A. Material Misstatements and Omissions under the Securities Act

Sections 11 and 12(a)(2) of the Securities Act impose liability when a registration statement or prospectus contains an untrue statement of material fact, omits a material fact required to be stated, or omits a fact necessary to make the statements made not misleading. Id. at 358-60. Section 15 imposes liability on individuals or entities that "control[] any person liable" under §§ 11 or 12. 15 U.S.C. § 77o. These provisions generally do not require a plaintiff to plead scienter, reliance, or loss causation. In re Morgan Stanley, 592 F.3d at 359.

Defendants argue that plaintiff has failed to plead any material misstatement or omission. A false statement or misleading omission is material if a reasonable investor would have viewed a complete and truthful disclosure as having "significantly alter[ed] the total mix of information already made available." In re ProShares Tr. Sec. Litig., 728 F.3d 96, 102 (2d Cir. 2013) (citation omitted).

To determine whether a statement is false or misleading, courts examine the defendant's representations as a whole and in context, instead of the "literal truth of an isolated statement." In re Morgan Stanley, 592 F.3d at 366 (citation omitted). Under Second Circuit law, even in the absence of an independent duty to disclose, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250 (2d Cir. 2014). Consequently, when a participant chooses to make a disclosure, "whether voluntary or required, the representation must be complete and accurate." In re Morgan Stanley, 592 F.3d at 366 (citation omitted).

A statement of opinion may support liability, even if the speaker sincerely held the stated belief, where the opinion contains an embedded statement of untrue fact, or if the speaker omitted material facts concerning the basis for the opinion that conflict with what a reasonable investor would understand from the statement. Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 185-89 (2015). Risk disclosures can also be actionable half-truths when a company warns about a risk that could have an impact on the company when, in fact, that risk has already materialized. See Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words

about future risk cannot insulate from liability the failure to disclose that the risk has transpired.”).

The SAC challenges four categories of statements: statements concerning the Fund’s liquidity, the valuation of its assets, its investments in defaulted securities, and its investments in the same or related businesses. Each category is addressed in turn.

1. Liquidity

The SAC first alleges that the registration statements falsely represented that the Fund would not hold more than 15% of its net assets in illiquid investments, while the Fund held illiquid investments in excess of that threshold throughout the Class Period. The registration statements defined an “illiquid investment,” consistent with SEC Rule 22e-4, as an investment that the Fund “reasonably expects cannot be sold or disposed of in current market conditions in seven calendar days or less without the sale or disposition significantly changing the market value of the investment.”

The SAC plausibly alleges that the Fund’s representations in its SEC filings regarding illiquid investments were false. It identifies securities which put the Fund’s portfolio over the 15% limit throughout the Class Period, securities which exhibited numerous characteristics that it alleges are

indicative of illiquidity. Among other things, many of the securities traded infrequently, lacked active secondary markets, were privately placed, were concentrated among relatively few holders, were valued using significant unobservable inputs, and, where contemporaneous market transactions occurred, traded at prices materially below the Fund's reported values. Drawing all reasonable inferences in plaintiff's favor, the SAC plausibly alleges that the challenged securities met the Fund's definition of an illiquid investment throughout the Class Period.

Defendants argue that these allegations are insufficient because neither Rule 22e-4 nor the registration statements define an illiquid investment by reference to any particular economic characteristic. They further contend that plaintiff improperly substitutes its own conception of liquidity for the regulatory standard, conflates valuation with liquidity, and relies impermissibly on hindsight, particularly the prices realized during the Fund's June 2025 liquidation.

These arguments may ultimately bear on the weight of plaintiff's evidence, but they do not warrant dismissal at the pleading stage. The Court need not determine whether any individual characteristic identified by plaintiff -- or even the combination of characteristics alleged in the SAC -- necessarily establishes that a security is an illiquid investment as defined

in the registration statements. Nor must the court determine whether defendants' competing interpretation is more persuasive. At this stage, all reasonable inferences are drawn in plaintiff's favor. Viewed through that lens, the SAC's detailed allegations support the inference that the securities could not have been sold within seven days without "significantly changing" their market value and are sufficient to state a claim.

Contrary to defendants' argument, the SAC does not rely solely on hindsight. Defendants correctly observe that the prices realized during the Fund's June 2025 liquidation would not, standing alone, establish the falsity of the registration statements when they became effective. The SAC, however, relies principally on allegations regarding the structure of the market for the challenged securities, their trading characteristics, and their marketability. The subsequent liquidation is only corroborative evidence of plaintiff's theory that the challenged securities were illiquid throughout the Class Period.

Defendants likewise correctly observe that valuation and liquidity are distinct concepts and that a Level 3 classification does not itself establish that a security is an illiquid investment. The SAC, however, does not premise its illiquidity theory on Level 3 classifications alone. Those

classifications formed one component of a broader constellation of facts supporting plaintiff's contention that the challenged securities were illiquid.

Finally, defendants argue that the registration statements' extensive risk disclosures foreclose plaintiff's claim because they warned investors that below-investment grade municipal securities could become illiquid. Those disclosures do not require dismissal. The SAC alleges not merely that the Fund faced the risk that its investments might become illiquid in the future, but that, when the registration statements were issued, the Fund already held more than 15% of its net assets in investments meeting the Fund's own definition of an illiquid investment. Accepting those allegations as true, the challenged risk disclosures do not defeat plaintiff's claims as a matter of law. Accordingly, defendants' motion to dismiss is denied as to the SAC's liquidity allegations.

2. Valuation

The registration statements and prospectuses represented that the Fund's assets were "generally valued at their market price on the valuation date and are based on valuations provided by independent pricing services consistent with the Trust's valuation procedures." When "market prices are not readily available," the fair value is "determined under fair value

pricing procedures approved by the Board." The SAC alleges that those representations were misleading in two respects. First, they failed to inform investors that pricing services disregarded odd-lot transactions, even though odd-lot transactions may be the only indicator of market sentiment for distressed issuers or bonds. Second, they also failed to explain that the Board's procedures were materially defective, as shown by its overvaluation of Next Renewable Fuels. Investment-specific information for Next Renewable Fuels showed that it had been worthless since November 2023.

The defendants' motion to dismiss this theory of liability is granted. The SAC does not plead that the Fund misidentified the two sources from which it took its valuations -- either pricing services or the Fund's own valuation procedures -- or that it failed to apply the valuations given by those two sources. While the SAC complains that the valuation methodologies applied by the pricing services and by the Fund were deficient, that complaint does not allege a false statement in the SEC filings.

In support of its claims regarding valuation, the plaintiff argues that a reasonable investor would have understood that pricing services would use current market data, which the services did not. The plaintiff points to a portion of the

discussion of valuation risk that appears in several SEC filings. That warning regarding the valuation risk does not salvage this claim.

In describing valuation risk in the SEC-filings, the Fund explained that the sale price it could receive "may differ" from its valuation of the investment, particularly for thinly traded securities or when prices are provided by an independent pricing service. It explained that "municipal bonds . . . are typically valued by independent pricing services utilizing a range of market-based and security specific inputs and assumptions, including price quotations from broker-dealers making markets in such instruments, transactions in comparable investments and considerations about general market conditions." It added that the Fund's ability to value its investment may be impacted by "errors by pricing services." Read in its entirety, this warning does not represent that the pricing services used all current market data, even odd-lot sale data. Nor does it represent that the valuations provided by the pricing services would be accurate. To the contrary, it explains that pricing services have their own methodologies and that the valuations they provide may differ from the prices that the Fund can realize upon sale of an asset.

As for its claim about the overvaluation of Next Renewable Fuel, the plaintiff explains that its assertion that the security was worthless in November of 2023 is not conclusory. It does not address, however, the larger deficiency in its pleading of this theory. The SAC has only identified this one asset that was allegedly overvalued using the fair value procedures, a security which comprised just 3% of the Fund's holdings in May 2025. This disagreement over a single valuation, which is in most circumstances a matter of judgment and opinion, is insufficient to sustain this claim. See CSX Transp., Inc. v. Georgia State Bd. of Equalization, 552 U.S. 9, 10 (2007) (acknowledging that valuation is "not a matter of mathematics, but an applied science, even a craft," which can yield varying results); see also Omnicare, 575 U.S. at 185-89 (explaining the specific circumstances under which opinion statements may be actionable, none of which apply here).

3. Defaulted Securities

The SAC alleges that the Fund's SEC filings included two false statements regarding defaulted securities. The first statement concerns the purchase of securities that were in default. The registration statements stated that the Fund "may purchase defaulted securities," but that its investment adviser "does not expect that this will be a significant investment

strategy." The SAC alleges that this representation was materially misleading because, during the Class Period, defaulted securities represented as much as 35% of the Fund's assets and more than $60 million in reported value. These allegations are insufficient to state a claim.

The quoted statement addresses the Adviser's expectation concerning the Fund's strategy of purchasing securities that were already in default. The SAC, however, only alleges the amount of defaulted securities that the Fund held, without alleging that those securities were in default when acquired or that the Fund followed a strategy of purchasing already-defaulted bonds. The mere fact that a security defaults after its purchase does not establish that purchasing already-defaulted securities constituted a significant investment strategy. The SAC therefore does not plausibly allege that the challenged statement was untrue or misleading.

The SAC separately alleges that the Fund's 2024 semiannual and annual financial statements identified certain portfolio securities as being in default while allegedly failing to identify other securities that were likewise in default. Those financial statements were incorporated into the September, October, and December 2024 registration statements. Consequently, in those registration statements, the Fund

understated its exposure to distressed assets, which a reasonable investor would consider relevant in assessing the investment.

Defendants contend that the defaults had previously been disclosed in its 2022 and 2023 filings or were available through EMMA. But "the mere availability elsewhere of truthful information cannot excuse untruths or misleading omissions" contained in a registration statement. FHFA v. Nomura Holding Am., Inc., 873 F.3d 85, 122 (2d Cir. 2017) (citation omitted). Moreover, a registration statement must be materially accurate as of the date it becomes effective. See 15 U.S.C. § 77k (establishing liability as of the date "such part [of the registration statement] became effective"); cf. Dalberth v. Xerox Corp., 766 F.3d 172, 183 (2d Cir. 2014) (noting materiality is determined according to the "total mix of information made available" at that time (citation omitted)).

The SAC alleges that, having undertaken to identify defaulted portfolio holdings in the incorporated financial statements, defendants omitted other securities that were likewise in default. Accepting those allegations as true, plaintiff plausibly alleges that the Fund's descriptions of its defaulted holdings were materially misleading. Accordingly, the motion is denied insofar as plaintiff's Securities Act claims

are predicated on the alleged omission of the default status of certain portfolio securities from the incorporated financial statements.

4. Investments in the Same or Related Businesses

In a section titled Sector Emphasis Risk, the Fund's registration statements warned that securities issued by companies "in the same or related businesses ('industry sectors'), if comprising a significant portion of the Fund's portfolio," could respond similarly to economic or regulatory developments, which could affect the portfolio more severely than if it were more "diversified across a greater number of industry sectors." The SAC alleges that, at the time of those statements, the Fund had already invested between 11.77% and 18.97% of its net assets in bonds connected to the Jefferson Enterprise group of environmental companies. Those businesses allegedly shared management, facilities, commercial relationships, and financial dependencies, creating a risk that distress affecting one project would spread to the others.

These allegations fail to state a claim. The challenged statement made no representation about the extent to which the Fund was or was not diversified. Therefore, it cannot be construed as characterizing the Fund's holdings in a manner

inconsistent with the alleged Jefferson Enterprise exposure. The SAC therefore identifies no untrue factual assertion.

Plaintiff argues that the challenged statement was misleading merely because the Fund had already made the investments that generated the warned-of risk. But the SAC does not allege that any correlated losses from the Jefferson Enterprise investment had already materialized when the statements were issued.

The SAC also does not plausibly allege that the Fund was required to assess the Jefferson Enterprise companies as a single "industry sector." The companies shared ownership, management, and commercial relationships, but they remained separate issuers associated with several different projects and activities. The offering documents disclosed the Fund's individual holdings in each of those projects. Defendants were not required to adopt plaintiff's proposed grouping of those holdings absent an otherwise misleading statement or an independent disclosure duty. Because the SAC has not identified a false statement or misleading omission, the claims based on investments in the same or related businesses are dismissed.

B. Timeliness of the Securities Act Claims

Section 13 of the Securities Act requires an action under §§ 11 or 12(a)(2) to be brought within one year after discovery

of the untrue statement or omission or after such discovery should have been made through reasonable diligence. 15 U.S.C. § 77m. Section 11 claims are also subject to a three-year statute of repose running from the date the security was bona fide offered to the public, while § 12(a)(2) claims are subject to a three-year statute of repose running from the sale. Id. The Class Period begins on July 29, 2022, less than three years before this action was filed on July 24, 2025. Defendants rely instead on the one-year limitations period.

The one-year limitations period begins to run "when the plaintiff discovers (or should have discovered) the securities-law violation." Nomura Holding Am., Inc., 873 F.3d at 119 (citation omitted). "A securities-law violation is discovered when the plaintiff learns sufficient information about the violation to plead it in a complaint with enough detail and particularity to survive a Rule 12(b)(6) motion to dismiss." Id. (citation omitted). Where publicly available information provides a "storm warning" of a potential securities-law violation, courts "deem the plaintiff on inquiry notice and assume that a reasonable person in his or her shoes would conduct further investigation into the potential violation." Id. The limitations period does not begin to run, however, until that hypothetical investigation would have uncovered

"sufficient information to plead a securities-law violation adequately." Id. (citing Merck & Co. v. Reynolds, 559 U.S. 633, 651 (2010)).

To trigger the duty to inquire, information in the storm warning must "relate[] directly to the misrepresentations and omissions the plaintiff alleges," Sherman v. Abengoa, S.A., 156 F.4th 152, 162 (2d Cir. 2025) (citation omitted), and be "specific enough to provide an ordinary investor with indications of the probability (not just the possibility) of" a securities-law violation. Nomura Holding Am., Inc., 873 F.3d at 120 (citation omitted). Courts also consider whether the news report containing the asserted storm warning was "sufficiently widespread" that a reasonable investor would likely have been aware of it. Meyer v. Seidel, 89 F.4th 117, 135 (2d Cir. 2023).

Defendants contend that, approximately eighteen months before this action was filed, the December 2023 Morningstar article supplied a storm warning. The article reported that the Fund told the SEC that it had missed a filing deadline because of difficulties valuing certain bonds in its portfolio. The article warned that this could cause "problems" if the Fund "were to try to liquidate [its] positions quickly." It did not, however, disclose the specific facts on which the SAC's surviving claim rests: that more than 15% of the Fund's assets

allegedly satisfied the Fund's own definition of illiquidity, or that the Fund understated its exposure to distressed assets. The article expressed concerns about a risky high-yield strategy, but it did not directly reveal the alleged falsity of the Fund's particular disclosures. Moreover, the Court cannot determine from the pleadings that the article was sufficiently ubiquitous to put a reasonable investor on inquiry notice of these claims in December 2023. See id. at 135-36.

C. Section § 14(a) of the Exchange Act

Count IV asserts a claim under § 14(a) of the Exchange Act and Rule 14a-9. Section 14(a) prohibits the solicitation of proxies "in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a)(1). Rule 14a-9, in turn, prohibits proxy solicitations by means of a statement that is "false or misleading with respect to any material fact" or that omits a material fact necessary to make the statements made not false or misleading. 17 C.F.R. § 240.14a-9(a).

Plaintiff alleges that the Proxy violated § 14(a) and Rule 14a-9 by misstating the Fund's liquidity, valuation methodology, investments in defaulted securities, and investments in related businesses. Defendants argue that the

SAC fails to plead materiality, transaction causation, loss causation, and negligence.

To state a claim under § 14(a), a plaintiff must plausibly allege, among other elements, that the challenged misstatement or omission in proxy materials was material to the shareholder vote. In Re Shanda Games Ltd. Sec. Litig., 128 F.4th 26, 56 (2d Cir. 2025). A fact is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." Resnik v. Swartz, 303 F.3d 147, 151 (2d Cir. 2002) (quoting Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1090 (1991)). Although the Proxy also served as a registration statement and prospectus for the shares to be issued in the reorganization, § 14(a) specifically protects the integrity of the shareholder vote. See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 381 (1970) (describing statute's aim as "fair corporate suffrage" (citation omitted)). The relevant inquiry is therefore whether the alleged misstatements were "material" to a reasonable shareholder's vote on the proposed reorganization. Id. at 384. Alleging that any misstatement "actually had a decisive effect on the voting," however, is not required. Id. at 385.

As discussed above, the SAC adequately alleges that certain of the challenged statements could be material to a reasonable

investor evaluating the value and risks of investing in the Fund. Those allegations are sufficient, at this stage, to support plaintiff's Securities Act claims. But the SAC does not plausibly allege how those same alleged misstatements would have affected a reasonable shareholder's evaluation of the proposed reorganization, on which they were being called to vote.

The Proxy advised shareholders that they were being asked to approve the reorganization of the Principal Street High Income Municipal Fund into the Easterly ROCMuni High Income Municipal Bond Fund, a move aimed primarily at lowering the Fund's operating expenses. The Proxy further represented that the two Funds "have the same investment objectives," "substantially similar principal investment strategies," and "invest in the same types of securities under the same portfolio management team," such that the "principal risks" associated with an investment in either Fund were "substantially similar."

As with the registration statements and prospectuses, the SAC alleges that the Proxy incorporated materially misleading disclosures concerning the Fund's liquidity, valuation practices, and portfolio composition. Plaintiff asserts that truthful disclosures on these topics would have altered the total mix of information available to shareholders regarding the proposed reorganization. The SAC does not, however, allege how

the asserted deficiencies in the Fund's liquidity management, valuation methodology, or portfolio construction bore on the merits of the reorganization itself, as opposed to the value and risks of the Fund shares. The SAC's conclusory assertion that the alleged misstatements altered the "total mix" of information regarding the reorganization is therefore insufficient to state a claim under § 14(a). In light of that conclusion, it is unnecessary to address defendants' alternative arguments regarding transaction causation, loss causation, and negligence.

D. Control-Person Liability

1. Section 15 of the Securities Act

Count III asserts control-person liability under § 15 of the Securities Act. To state a claim, plaintiff must plead a primary violation of the Securities Act and control of the primary violator by defendants. In re Lehman Bros. Mortg.-Backed Sec. Litig., 650 F.3d 167, 185-87 (2d Cir. 2011). In this context, control means "the power to direct or cause the direction of the management and policies of the primary violators whether through ownership of voting securities, by contract, or otherwise." Id. at 185 (citation omitted). The power to advise, influence, or provide services is not necessarily the power to direct the primary violator's management and policies. Id. at 187.

As explained above, the SAC adequately alleges primary violations under §§ 11 and 12(a)(2). In their motion, defendants do not argue that the SAC fails to allege control by the trust officers and trustees, including defendants Eirich, Wiedmeyer, Kern, Massart, Swanson, Rush,[4] Crate, Montague, Medugno, and Spencer, all of whom either signed the challenged registration statements, were responsible for the Fund's financial reporting, or served as trustees who approved the challenged registration statements.

Defendants do challenge, however, the sufficiency of the allegations against the Fund's portfolio managers, defendants Willis and Pulire, and its investment advisors, Principal Street Partners and Easterly Investment Partners. The SAC alleges that, as executives of Principal Street Partners and Easterly Investment Partners, defendants Willis and Pulire chose the Fund's investments, internally assigned ratings to those securities, and were responsible for implementing the Fund's liquidity management program. It does not, however, allege that either possessed authority over the management or policies of the MPS Trust or Easterly Trust, signed the challenged

[4] Leonard Rush, an independent Trustee of the MPS Trust, was formerly a defendant but is now deceased. Plaintiffs added Ann Clark Johnston-Rush, executrix of his estate, as a defendant in the SAC.

registration statements, or exercised control over the preparation or issuance of those statements.

The SAC alleges that Principal Street Partners and Easterly Investment Partners managed the Fund pursuant to investment advisory agreements, oversaw portfolio management, valuation, and liquidity functions, and furnished personnel to perform those services. It also alleges, however, that they performed those functions subject to the supervision of the respective boards of trustees. The SAC does not allege nonconclusory facts showing that either adviser possessed authority to direct the management and policies of the Trusts themselves or the issuance of the challenged registration statements. Under Lehman Brothers, the provision of advice and portfolio-management services, even if important, does not itself establish the power to direct the primary violator. 650 F.3d at 187.

Count III is therefore dismissed as to Willis, Pulire, Principal Street Partners, and Easterly Investment Partners. It survives as to the officers and trustees named in that Count.

2. Section 20(a) of the Exchange Act

Count V asserts control-person liability under § 20(a) of the Exchange Act. Such a claim requires a primary violation of the Exchange Act. Carpenters Pension Tr. Fund of St. Louis v.

Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014). Because Count IV is dismissed, Count V must also be dismissed.

## Conclusion

Plaintiff's April 23, 2026 motion to strike is granted to the extent defendants seek to rely on the challenged exhibits for the truth of disputed assertions or to contradict the SAC's well-pleaded allegations. It is otherwise denied, as is plaintiff's request to convert the motion to dismiss into one for summary judgment.

Defendants' March 23, 2026 motion to dismiss is granted in part as to Counts I and II. It is denied to the extent those Securities Act claims rest on alleged misrepresentations that the Fund will not hold more than 15% of its net assets in illiquid investments and its understatement of its exposure to distressed assets. The motion is granted as to Counts IV and V, and as to Count III insofar as that Count is asserted against Troy Willis, Charlie Pulire, Principal Street Partners and Easterly Investment Partners.

Dated: New York, New York
August 17, 2026

DENISE COTE
United States District Judge